FRANK HAWKINS et al. *v.* BOARD OF SUPERVISORS OF CARROLL COUNTY.

| 50 | 735 |
| f85 | 731 |
| 85 | 734 |

1. SUBSCRIPTIONS — ART. 12, SEC. 14 OF THE CONSTITUTION — EFFECT THERE_ OF. — The language of this section assumes that the authority of the legislature is necessary to enable a county, city or town to become a stockholder or to lend its credit.  And this discretion is prohibited, " unless two thirds of the qualified voters of such county, city, etc., at a special or general election shall assent thereto."  This section was manifestly intended to guard and protect the local public from the burden of taxation incident to aid extended to railroad corporations, etc.

2. SAME — HOW PERFORMED. — Aid can be extended to railroad corporations, turnpike companies, etc., by counties or cities, only upon the theory that such internal improvements are for the local public benefit, conducive to the prosperity and common welfare of the local public.

3. ELECTIONS — REQUISITE MAJORITY — RULE AT COMMON LAW. — The rule at common law is that where the electoral body is indefinite, a majority of the votes cast determines the election.  This principle was originally applied to corporations aggregate, to the elections of officers, but it has been extended in analogous cases to questions propounded to be adopted or rejected.  This rule originated in necessity.

4. SAME — POWER OF THE LEGISLATURE. — In the absence of any constitutional restrictions, it is competent for the legislature to prescribe the

requisite majority to carry a measure of aid, and unless such majority vote for the measure, it fails.

5. ELECTIONS — MODE OF DETERMINING. — Unless the law under which the vote is taken intends otherwise, the ballot is the test of the number of electors, and that those who refrain from voting acquiesce in what the majority voting do. This is so because of the insuperable difficulty of getting any other mode.

6. TAXATION — ITS OBJECTS- — Taxes are burdens imposed upon people or property by the legislature for public purposes. The object to which aid is extended by a municipality must be public in the sense that it will contribute to the convenience and general advantage of the local public, and such aid should only be extended to those objects which have been recognized by legislative and judicial precedents, as such local public objects among which is a railroad. But this has not met the universal approval of the judicial mind.

7. CONSTITUTIONAL CONSTRUCTION — RULE THEREOF. — The object of construction applied to the constitution is to give effect to the intent of its framers and the people in adopting it. This intent is to be found in the instrument itself. If the words convey a definite meaning which involves no absurdity or contradiction with other parts of the instrument, then that meaning, apparent on its face, is to be adopted.

8. SAME — ASSENT — MEANING THEREOF. — The word assent used in sec. 14, art. 12, of the constitution, must be given its usual and ordinary signification, and that is " agreeing or consenting to," and this can be manifested in an election only by an affirmative action, by actually voting.

9. REGISTRATION — EFFECT THEREOF. — The constitution, art. 8, sec. 2, requires all persons entitled to vote, to be registered; it is a prerequisite to the right to vote. Thus there exists, in every county, evidence of the number entitled to vote. In ascertaining the result of an election requiring two-thirds of the qualified voters to assent thereto, the registration books are competent evidence. It would be open to proof to show deaths, removals, etc., subsequently incurred. The term " qualified electors," used in the constitution, means those who possess the constitutional requisites to register.

10. BOARDS OF SUPERVISORS — POWERS THEREOF. — These are *quasi* corporations, with a general jurisdiction of the subjects confided to them in sec. 20 of art. 6 of the constitution. The grant of a power of an extraordinary character, such as is not embraced in the general scope of its duties, must be strictly construed. When exerting jurisdiction under a special law, it must act strictly on the condition under which it is given. A county, city or town has no inherent right to become a stockholder or

to give aid to a railroad or other association for making public improvement. If empowered so to do, it must conform to the conditions prescribed in the law. The board of supervisors is made, by law, the instrumentality of the county, but its power does not come into existence except upon certain conditions, which are of the nature of conditions precedent.

11. CASE IN JUDGMENT. — The court reviews at length all the decisions, both state and federal, on the question, as to what defenses can be made to bonds after they get into hands of purchasers for value and without notice. But none of the bonds, in this case, having been issued, this question was not involved, and the court expressed no opinion on the subject.

APPEAL from the Chancery Court of Carroll County.   Hon. P. P. BAILEY, Chancellor.

This bill was exhibited by citizens and tax-payers to restrain the issuance and delivery of bonds of Carroll county, to the amount of $125,000, as a subscription to the capital stock of the Greenville, Columbus & Birmingham Railroad Company, and the levy and collection of taxes for the payment of said bonds. The *gravamen* of the complaint is that the election, by virtue of which the bonds were about to be issued, is void for want of conformity to law, and that two-thirds of the qualified voters of Carroll county had not assented thereto, at a special election, or regular election, held therein. Injunction was granted and issued upon a bond by complainants for $2,500. On motion of defendants, the chancellor, in vacation, ordered that complainants should, within twenty days, give an additional bond for $30,000, and on failure to give it, the injunction should stand dissolved. The bond was not given, and on the 10th day of April, 1874, a decree was rendered, in term time, against complainants and sureties on the first bond, for 10 per cent. damages on the amount of taxes levied for the bonds, and due at the time of the injunction, amounting to $783.09.

An amended and supplemental bill was then presented, showing that, since the occurrences above stated, the bonds of Carroll county had been prepared and executed by the board of super-

47

visors, and delivered to trustees appointed by them, to be delivered to the railroad company, *pari passu*, with the progress of work in the county, and that these trustees, if not restrained, would deliver the bonds, which are payable to bearer, to the company; and upon this supplemental showing, in connection with the original bill, injunction was prayed against the trustees holding the bonds, and against the board of supervisors. Injunction was granted, by a circuit judge on bond for $25,000, which was given and the injunction issued. The prayer of the bill is to perpetually enjoin the delivery of the bonds, and to have them cancelled, and to restrain the board of supervisors from the future execution and delivery of bonds for subscription to said company, by virtue of said election, and to prevent the levy and collection of taxes for payment of interest and principal of said bonds. The supervisors, the trustees holding the bonds, and the railroad company, were parties defendant, and an agreement was made and filed by solicitors of the respective parties, as to the facts of the case, and in this, it is stipulated that a *final hearing on the merits* should be had and, if the court is of the opinion that, on the facts, complainants are entitled to a perpetual injunction, it is to be granted; but if, on the facts, they are not entitled to relief, the bill is to be dismissed, and such decree is to be made in reference to the former decree for 10 per cent. damages, as is considered proper. All questions of the sufficiency of the pleadings to present the facts agreed on, are mutually and reciprocally waived by both sides, and the judgment of the court is to be had upon the rights of the parties, as presented by the written statement of facts agreed on, with the object of obtaining final *hearing on the merits.*

### STATEMENT OF FACTS AS AGREED ON.

On the 5th of March, 1872, the Arkansas City and Grenada Railroad Company was incorporated. Acts of 1872, p. 347. The company organized under this charter within ten days after its approval. On the 4th of March, 1873, this company was con-

verted into the Greenville, Columbus & Birmingham Railroad Company.   Acts of 1873, p. 606.

On 3d of March, 1873, an application was made by D. A. But- terfield, president, etc., for an election for subscription, by Carroll county, to the G., C. & B. R. R. Co., and on the same day the board of supervisors made an order for submission of the ques- tion to the voters.

On the 2d of April, 1873, the registrars of said county filed with the clerk their return of said election, which, at the next meeting of the board of supervisors, on the 23th of April, 1873, was, by order of said board, spread on its minutes, and shows 918 votes for, and 362 against subscription.

Notice of the election was duly given by the registrars, and the election was held by them, and officers appointed by them, and not by appointees of the board of supervisors.   Notice of the election was published by the registrars in the official newspaper of the county.

The registration books of Carroll county showed, on 1st of April, 1873, 3,129 names of qualified voters, and it is admitted, as a fact proved, that on 1st April, 1873, there were in Carroll county from 2,000 to 2,500 qualified electors, and that 2,800 votes were polled in said county at the presidential election on the 5th day of November, 1872, and 1,900 votes at the November election, 1873.   At the July term, 1873, of the board of supervisors, But- terfield applied for bonds, and the order was made for their issu- ance and delivery to three trustees named, and an order was made for the levy of 80 *per cent.* on the state tax for 1873.   A bond for $50,000, conditioned for proper application of the bonds or pro- ceeds, was given by Butterfield, with sureties, and was approved. The trustees are men of character, and amply solvent, but are un- der no bond.

On 24th of May, 1874, an election was held in Carrollton for a subscription of $20,000, to this company, which resulted in favor of it, and this result was induced by the result of the previous

county election.  An election was held in Washington county for a subscription of $200,000 to this company, and resulted in favor of it, and was influenced, in a large degree, by the result of the election in Carroll county.  Prior to the 24th of January, 1874, eight or nine miles of grading on the line of said railroad were done in Carroll county, at a cost of $20,000, and since that, about $12,000 worth of work on the road bed in said county has been done.  Before the 24th of January, 1874, $37,000 had been expended in Washington county by the company, payable out of the subscription of that county, and a considerable amount since that date.

In June, 1873, the railroad company entered into a contract with a construction company to complete the work on the whole line.  The bonds are all in the hands of the trustees, except $15,500 of them, which have been delivered to the construction company, on the order of the railroad company, since the 18th of May, 1874.

The relevancy and competency, as evidence of all the foregoing facts, are reserved on both sides, but no objection is made by either, on account of the sufficiency of the pleadings to admit the facts.  Objection is made to the competency of such facts under any state of pleadin

The chancellor dismissed the bill, and complainants appealed.

The Constitution of Mississippi, art. VII, is :

SEC. 1.  All elections by the people shall be by ballot.

SEC. 2.  All male inhabitants of this state, except idiots, and insane persons, and Indians not taxed, citizens of the United States, or naturalized, twenty-one years old, or upwards, who have resided in this state six months, and in the county one month, next preceding the day of election at which said inhabitant offers to vote, and who are duly registered according to the requirements of section three of this article, and who are not disqualified by reason of any crime, are declared to be qualified electors.

SEC. 3.  The legislature shall provide, by law, for the registration of all persons entitled to vote at any election, and all persons

entitled to register, shall take and subscribe to the following oath or affirmation:     *     *     *

ARTICLE XII. — GENERAL PROVISIONS.

*     *     *     *     *     *     *     *

SEC. 5. The credit of the state shall not be pledged or loaned in aid of any person, association, or corporation; nor shall the state, hereafter, become a stockholder in any corporation or association.

*     *     *     *     *     *     *     *

SEC. 14. The legislature shall not authorize any county, city or town to become a stockholder in, or to lend its credit to, any company, association or corporation, unless two-thirds of the qualified voters of such county, city or town, at a special election, or regular election, to be held therein, shall assent thereto.

*J. A. P. Campbell*, for appellants:

Two prominent ideas are embraced in the language employed in section 14, article XII, viz: 1. That a county, city or town shall not become a stockholder in, or lend its credit to, any company, association or corporation, except upon a condition precedent, which is prescribed. 2. The condition precedent, without which that which is prohibited, shall be unlawful.

The prohibition is operative on counties, cities and towns, as well as on the legislature; because, without legislative authorization, a county, city or town cannot become a stockholder, or lend its credit to any company, association or corporation, and legislative authorization, in disregard of the constitutional prohibition, would be void.

The condition is, the assent of two-thirds of the qualified voters of such county, city or town, given at a special election, or regular election, held therein, according to law.

The principle is, that they who are to bear the burden of such expenditure for extraordinary municipal purposes, shall be exempted from it, unless two-thirds of the whole number entitled to

vote in such county, city or town, shall first *assent* to it at the ballot box.

The expression, "qualified voters," means more than those who actually vote. All possessing the constitutional qualifications are qualified voters, whether they vote or not.

When we speak of the "qualified voters" of states, counties, cities or towns, we mean those entitled to vote. This is the universal popular usage. Webster's Dict.; Worcester's Dict.

This is the legal sense of the term "voter." Bouvier's Law Dict.

This is the sense in which the constitution uses it. The phrases "qualified electors" and "qualified voters," and "persons entitled to vote," are employed indifferently and synonymously by the constitution. They are used as convertible terms, signifying the same in the constitution. Thus, in section 3, article VII, "the registration of all persons entitled to vote;" and section 19, article VI, "the clerk of the circuit court, and the clerk of the chancery court, shall be elected by the *qualified voters* of their several counties." As to the other officers provided for by the constitution, the expression is, "by the qualified electors." Thus it is plain that the phrases, "qualified electors," and "qualified voters," in the constitution, are equivalent and always mean those qualified according to the requirements of the constitution to exercise the elective franchise, and as the constitution is to be interpreted by itself, and is to be viewed as a harmonious whole, with its several parts fitly joined together, and each bearing on the other, when it declares a thing shall not be lawful without the assent of a fixed proportion of the "qualified voters," it means those possessing *all* the prescribed qualifications it has enumerated. "As a general thing, it is to be supposed that the same word is used in the same sense, wherever it occurs in a constitution." Cooley's Con. Lim., p. 62; Green v. Weller *et al.*, 32 Miss., 650.

The phrase, "two-thirds," relates to the constituent body — those qualified to vote, and not to those who actually vote, be-

cause "a qualified voter," is an expression broader than one who votes, and embraces one who is qualified according to the constitution.

OUR SYSTEM OF REGISTRATION OF VOTERS.

Registration, as provided for by the constitution, is designed to secure the judicial ascertainment and listing of "all persons entitled to vote at any election," and no one is entitled to vote until he has been registered, as provided for.  He may be of the prescribed age, and have the prescribed residence, and possess every other qualification, but until he has been "duly registered," he is not a "qualified elector," nor "entitled to vote at any election." Therefore, the books of registration show all "qualified electors," or "persons entitled to vote at any election," or having the "right to vote," as expressed in section 6, article VII.

Registry acts, with reference to elections, have often been merely to regulate the exercise of the right to vote, not to *confer it*.  They are usually election regulations established to facilitate the conduct of elections, and not a system by which the possessor of the other prescribed qualifications of a voter perfects and completes his qualifications as such.  Under our system, registration is the *investiture*, and the evidence, of the right to vote, and the register of a county is the list of the "qualified voters of such county."  Leading Cases on Elections (Brightly), p. 361; Auld v. Walton, 12 La. An. R., 129; Hardesty v. Taft, 23 Md., 512; Anderson v. Baker, id., 531; State v. Bond, 38 Mo., 425; State v. Albin, 44 id., 346; Ensworth v. Albin, 46 id., 453; People v. Kopplekom, 16 Mich., 342; State v. Hilmantel, 21 Wis., 566; State v. Stumpf, 23 id., 630; Byler v. Asher, 47 Ill., 101; Capen v. Foster, 12 Pick., 485; State v. Staten, 6 Coldwell, 233; Cooley's Constitutional Limitations, 603.

"*At a special election, or regular election, to be held therein.*" — Fixing the *mode* in which, and the time at which, the qualified voters shall assent, so as to exclude assent by petition, or written consent, or oral consent, and every other mode than at the ballot

box, and by ballot, and at a special election, or regular election, to be held therein, according to law. The clause under consideration has no reference to the *number* of voters, or the prescribed proportion, " two-thirds," but simply prescribes the *manner* in which the requisite proportion of the whole number of the " qualified voters of such county, city or town, shall assent thereto."

" *Shall assent thereto.*" — That is, shall *act* in agreeing to it. *Ad sentio* — not remain passive ; not be silent, nor acquiesce in, but shall *vote* for the proposition. There is not a word in the constitution about *dissent.*

The opponents of the proposal are not required to attend a special election or regular election. Two-thirds of the qualified voters of such county, etc., must attend the polls, and vote for it, and thus *assent* thereto. The contrary view requires a certain proportion of the qualified voters of a county; city or town to *dissent*, whereas the constitutional requirement is, that two-thirds must *assent.*

The term *assent,* implies affirmative action, and the idea is not met by inaction or indifference.

### GENERAL REMARKS.

The state is absolutely prohibited from lending its credit in aid of any person, association or corporation, or becoming a stockholder in any corporation or association : Article XII., sec. 5, constitution. Because it was determined that in no case could it be proper for the state to do this. But, as it was considered that there might be public enterprises, affecting particular localities, as counties, cities and towns, it was determined that they should not be *prohibited* from aiding them, but *restricted* in such way as to preclude the danger of indiscretion or abuse by prohibiting them, not absolutely, but until in a given case two-thirds of those entitled to vote, as prescribed in the constitution, should *assent* to it, at a special or regular election — that the entire property and industry of county, city or town, shall not be charged with such bur-

den, without the affirmative action of so large a proportion of those interested, as to preclude the idea of injudicious action. This was deemed a sufficient safeguard, and yet consistent with the proper exercise of the qualified right of counties, cities and towns to aid suitable public enterprises, worthy of such aid, as evinced by the support at the polls of so large a proportion of those to be affected as two-thirds of the whole number of those qualified to vote.

The constitution, which our present one succeeded and superseded, did not prohibit the state from being a stockholder in any corporation or association, and it permitted the state to lend its credit or pledge its faith, and it contained no prohibition or restriction upon counties, cities or towns, in this respect.

Without this restriction, it were competent for the legislature to authorize counties, cities and towns to become stockholders in, or lend their credit to, any company or corporation upon terms which the legislature might prescribe, but bitter experience having demonstrated the danger of such power, the great importance of the subject led to the incorporation into the organic law of this provision to cure this mischief, and prevent the great evil which might result from the absence of such restriction.

Consider the old rule, the mischief and the remedy, and what construction will most effectually cure the mischief and advance the remedy. Can it be doubted that, to require two-thirds, by actual count, of all the qualified voters of county, city or town, will more effectually accomplish the manifest purpose of the framers of the constitution to shield the citizens against improvident aid to public enterprises by counties, cities and towns ? Cooley's Const. Limitation, 55.

This construction best accords with the general spirit of the constitution in its prohibition to the state, and restriction on counties, cities and towns on this subject, and will better subserve its purpose.

" The whole is to be examined with a view to arriving at the

true intention of each part." Cooley's Const. Limitations, 57 *et seq.*

OBJECTIONS CONSIDERED.

The objection that it is impracticable to determine with accuracy whether two-thirds of all the qualified voters of a county, city or town have assented, is unfounded.   It is capable of as absolute certainty as human testimony can ever furnish.   A comparison of the poll lists, showing who voted, with the registration books, showing who were entitled to vote, will show *prima facie*, at least, what proportion voted assent, and it is matter of evidence who of those registered (as the list is corrected and revised within a few days before every election) have died, become disqualified or permanently removed, and have thus ceased to be qualified voters ; and, if there are names improperly on the registration lists, because of the want of other constitutional qualifications, that can be shown, as matter of fact, and, if striking off all names of persons dead, disqualified or removed after registration, and those proved to have been improperly admitted to registration, the whole number is reduced so as to embrace only those legally entitled to vote, it is easy, by comparison of those voting with those entitled to vote, to ascertain what proportion have assented.   Evidence may easily be had of deaths and removals, and certainty may be attained.

The registration books are expressly declared by law to be *prima facie* evidence of the right to vote. Code 1871, section 373, and copies from them are competent evidence. Code, section 814. They are competent evidence on common law principles.   1 Starkie on Ev., 195 ; 1 Greenleaf Ev., sec. 483.

But, it is said, it is contrary to the genius of our system to consider of those who stay away from the polls.   This is conceded as applied, ordinarily, to elections.   The functions of government must be performed with ceaseless regularity.

*The assent of no proportion* of qualified voters is required to elect any officer, but in this the assent of " two-thirds of the qualified vot-

ers of such county," etc., is required.    In the one case reference is had to the necessities of government and the convenienee of its administration, and the *preclusion of the failure* of an election. But in the matter under consideration, a wholly different rule is introduced.

## THE QUESTION CONSIDERED WITH REFERENCE TO THE AUTHORITIES.

The common law doctrine, applied to corporations, as to *definite* and *indefinite* numbers, and usually cited against the view here contended for, is rather an authority in support of it.

Counties are not corporations.    They are so feebly endowed with corporate life as to be called *quasi* corporations.    They are unlike the *towns* of the New England states, where "all of the qualified inhabitants meet and directly act upon and manage, or direct the management of their own local concerns."    Dillon Munic. Cor., section 10, *et seq.*

Under our system of definite judicial ascertainment by registration of the qualified voters, a county approaches far more nearly the character of a *definite* number than an *indefinite* number of persons or corporations composing the body.    Dillon Municipal Corporations, section 215.

No decision, which can be cited, has any application to our constitutional system, as will be shown on a particular examination of the cases.    *Ratione cessante lex ipsa cessat.*

The cases which may be cited as precedents for the proposition that "two-thirds of the qualified voters of such county" means two-thirds of those voting, are the following, viz:   Railroad v. County Court, 1 Sneed., 637; State v. Mayor, 37 Missouri, 270; State v. Binder, 38 Missouri, 450; People v. Warfield, 20 Illinois, 159; People v. Garner, 47 Illinois, 246; People v. Wiant, 48 Illinois, 263; Township v. Rogers, 16 Wallace, 644.

A careful examination of these cases, so far from opposing the construction contended for in this argument, will vindicate it, as

applied to the constitution of Mississippi. In each stress was laid on the absence of any other *means of ascertaining the number of legal voters*, except the poll lists. As no means had been provided for ascertaining and determining who were legal voters, except the decision of the inspectors of elections at the ballot boxes, as shown by the poll lists, it was an inference that the legislative purpose was, that a "majority of those who actually vote" should determine.

The constitutional scheme of Mississippi as to elections, voters and registration, is *sui generis*, and unlike that which existed in the states of Tennessee, Missouri and Illinois, when the above cited cases were decided. We must follow to their logical results the several provisions of our own constitution on this subject. *Ut res magis valeat, quam pereat.*

Under our system the question is not, necessarily, nor allowably, to be determined by a count of ballots. This may well be allowed where no notice is taken of a voter until he appears at the polls, and is pronounced a qualified voter by the inspectors of the ballot box, and deposits his ballots, and is *registered* as a voter at that election; but the same reasoning which supports this, requires, under our system, the adoption of the registration books so showing the number of qualified voters.

EXAMINATION OF CASES SUPPORTING THE VIEW CONTENDED FOR IN THIS ARGUMENT.

The only state whose constitution is like ours, in its restriction upon counties, cities and towns, in this respect, is Missouri, whose constitution, adopted in 1870, has the restriction in the very words of ours, and in the only case reported on this subject, Carpenter v. Lathrop, 51 Mo., 483, the court, speaking of this provision, say: "This is a limitation on the power of the general assembly to confer the right, or power, upon counties and towns, to take stock in the companies named." In that case, the vote for subscription was unanimous, but the subscription was

held to be unauthorized, because, it appeared to be probable (among other things) that two-thirds of the qualified voters had not assented. The court refused to accept the two-thirds of those voting as decisive, for all who voted had voted for the subscription.

In State v. Winkelmeier, 35 Mo., 104, in which was construed a statute, which made the exercise of power to depend on the authorization of a "majority of the legal voters" of a city, it was held that the act required *a majority of all the legal voters* of the city, and not merely a majority of those voting, and the court seized upon the evidence to show that a majority of all did not vote. In all those cases, where power to act in such matters has been made to depend on the assent by petition of two-thirds of the tax payers, it has been held that the consent of the prescribed number must be given, and that this is an *affirmative* matter to be shown by those who claim the existence of the power. Starin v. Genoa, 23 N. Y., 439 ; Gould v. Sterling, ib., 456; Benson v. Mayor, etc., 24 Barb., 248; People v. Mead, 36 N. Y., 224; Duanesburgh v. Jenkins, 40 Barb., 574 ; State v. Saline Co., 45 Mo., 242.

In Bissell v. Jeffersonville, 24 How. (U. S.), 288, it is distinctly affirmed that where a law uses the expression, "majority of the legal voters," it means a majority of all, to be ascertained and determined as matter of fact.

In Green v. Weller, 32 Miss., 650, it was conceded by distinguished counsel, and affirmed by Judge Handy, delivering the opinion of the court, that the expression, "majority of the members of each house," in art. 7, sec. 9, of the then existing constitution, meant a majority of *all who had been elected, and were entitled to seats.*

Wherein does that expression require a majority of all the members entitled to sit, more than the expression, "two-thirds of the qualified voters of such county," requires two-thirds of all the qualified voters entitled to vote? Art. 7, sec. 9, of the

former constitution, was on a kindred subject to that under discussion.

### THE QUESTION NOT AFFECTED BY THE DECISION AND ACTION OF BOARD OF SUPERVISORS.

It would be monstrous that the board could conclusively decide the question as against the attempt to prevent the illegal issuance of bonds. There is, in that case, no remedy against the most flagrant outrage upon the constitution and rights of the people. The citizen must have the right to appeal to the courts, and they are *not powerless* to afford protection. Dillon on Municipal Corporations, section 416, et seq. ; Knox County v. Aspinwall, 21 How. (U. S.), 539 ; Bissell v. Jeffersonville, 24 ib., 288 ; New London v. Brainard, 22 Conn., 552 ; Tash v. Adams, 10 Cush., 252 ; Hood v. Lynn, 1 Allen, 103.

Apellants are not estopped. Bigelow on Estoppel, p. 480, 484 ; ib., p. 600 ; Herman's Law of Estoppel, sections 321, 327, 332, 409, 425, 435, 442. In the following cases the doctrine of estoppel was applied to citizens and tax payers : Society, etc., v. New London, 29 Conn., 174 ; Prettyman v. Supervisors, 19 Ill., 406 ; President v. Frick, 34 ib., 405 , Maher v. Chicago, 38 ib., 266. But those cases will be found to present features widely different from this.

*D. A. Holman,* on the same side, filed an elaborate brief, relying upon the same points substantially, and citing the same authorities.

*Harris & George,* for appellees, withdrew their brief and failed to return it in time.

SIMRALL, J., delivered the opinion of the court:

This bill was exhibited by the complainants, tax payers of Carroll county, to restrain the issuance and delivery of the bonds of Carroll county to the amount of $125,000 to the Greenville, Columbus and Birmingham Railroad Company. On the 3d of March, 1873, an application was made by D. A. Butterfield, president of the company to the board of supervisors, to submit to the electors of the county the proposition of making the subscription. On the

same day the order of submission was made, a special election was appointed for the 1st of April thereafter. The election was accordingly held. On the 2d of April, three registrars, Ely, Kimbrough and Doyle, filed with the clerk of the board of supervisors the returns, by which it appears that 918 electors voted for the subscription, and 362 against it.

Subsequently at a day in July, the board of supervisors declared that the proposition for subscription had been carried by a vote of two-thirds of the electors, and directed the bonds to be executed by the president, and placed in the hands of three trustees, named in the order. On the 1st of April, 1873, the registration books showed the names of 3,129 voters. It was admitted as proved, but its competency and relevancy was reserved, that there were from 2,000 to 2,500 qualified voters in the county; that 2,500 votes were polled at the presidential election, the 5th November, 1872, and 1,900 votes at the November election, 1873.

On these facts, the question was elaborately and ably discussed by counsel, whether, First, the election in favor of subscription, was carried in accordance with section 14 of article 12, general provisions of the constitution. It is as follows :

" SEC. 14. The legislature shall not authorize any county, city or town to become a stockholder in, or to lend its credit to, any company, association or corporation, unless two-thirds of the qualified voters of such county, city or town, at a special election, or regular election, shall assent thereto."

The language assumes that the authority of the legislature is necessary to enable the county, city or town to become a stockholder or lend its credit, and then puts a limitation upon legislative discretion and authority in an important particular, viz: the authority shall not be granted " unless two-thirds of the qualified voters of such county  *  *  *  at a special  *  *  *  or general election shall assent thereto."

The practice had grown up, and had been very generally adopted by the states, of allowing the civil municipal subdivis-

ions — as counties, cities and towns — to become stockholders in, or lend their credit to, railroad corporations, turnpike companies, etc., on the approving vote of a majority of the electors of such municipality. This was done by enabling acts of the legislature. The aid thus extended to these public local improvements was usually in the form of municipal bonds; the interest, and ultimately the principal, to be paid by taxes levied upon property. The power of taxation is delegated to these local bodies upon the theory, that the purpose to which the money is applied is for local public benefit, conducing obviously, and in a special manner to the prosperity and common welfare of the local community. At the time of the adoption of the constitution, the power of the legislature to authorize municipal aid to these enterprises, coupled with the 'delegated authority of taxation, was well established, both by legislative precedents and judicial decisions in this and the other states. It would be useless to cite the cases. There was great uniformity, too, in the terms upon which the stock might be subscribed, and the bonds issued. One condition was the vote of a majority of the electors.

The 5th section of the 12th article, prohibits the pledging the faith of the state in aid of any person, corporation    *    *    * nor shall the state become a stockholder in any corporation or association. The 14th section allows the right to a municipality which the 5th section denied to the state, but not "unless two-thirds of the qualified voters at an election assent thereto."

Manifestly, the intent was to guard and protect the local public from such burdens, unless upon the assent of two-thirds of the voters, manifested by an election.

It is contended on the one side, that the intendment of the 14th section is satisfied, if two-thirds of those who vote at the election, are for the subscription, although that may be less than two-thirds of the qualified voters of the county. On the other side, it is contended, that the question is not carried unless two-thirds of all the qualified electors vote for it.

The rule at common law was, " After an election has been proposed, whoever has a majority of those who vote, the assembly being sufficient, is elected.   Although a majority of the assembly abstain from voting, their silence will be construed an assent to the majority of those who vote."   An. & Am. Corp., § 127; Kyd. on Corporations, 1 vol., 422, states the rule thus : " An act done by a simple majority of a collective body, which concerns the common interest, shall be binding on the whole."

Dillon Municipal Corp., 1 vol., § 215, states the principle thus : " If an act is to be done by an indefinite body, it is valid, if passed by a majority of those present at a legal meeting.   No matter how small a portion these may constitute of the whole number entitled to be present, those who stay away are conclusively presumed to assent to what may be lawfully done by those who attend."

The statement of the principle by the supreme court of Pennsylvania in the St. Mary's church case, 7 S. & R., 517 is : " The fundamental principle of every association for self government, is that no one shall be bound except with his own consent, expressed by himself or his representatives, but actual consent is immaterial, the assent of the majority being the assent of all."

The principle which runs through the cases is, that a majority of the legal voters who choose to vote, constitutes an election.   A dissent without a vote is of no avail.   Oldknow v. Wainwright, 1 Wm. Bl., 229 ; Rex. v. Foxcroft, 2 Burr, 1017 ; First Parish of Sudberry v. Stearns, 21 Pick., 154.

This principle, that where the electoral body is indefinite, a majority of the votes cast determines the election, originally applied to corporations, aggregate, to the election of officers, has been extended in analagous cases to questions propounded to be adopted or rejected by votes.   1 Sneed. (Tenn.), 638 ; 21 Pick., 148 ; 37 Mo., 272 ; 38 Mo., 450 ; 16 Wallace, 644 ; 9 B. Monroe, 326.

It may be admitted, that in the absence of any constitutional

limitation or restriction, the legislature would be entirely compe-
tent at discretion, to prescribe the conditions upon which a county
could give aid to a railroad corporation.    It might make the
terms the consenting vote of two-thirds of the qualified electors,
and that those who did not vote for the aid should be counted
against it.    Under such a law it would be difficult to ascertain the
number of electors in the county.    Nevertheless the company
claiming the aid must show affirmatively the requisite majority
for it.    That question was suggested in Warefield's case, 20 Ill.,
160.    The constitution of Illinois allowed the removal of a
county seat, on a vote of a majority of the electors of the county.
The embarrassment of determining the result was alluded to, and
commented upon by the court.    The same point arose in Wiant's
case, 48, Ill., 263.    And the court went outside of the return of
the votes, on the proposition submitted, and took the vote cast at
the same election for circuit judge, which was larger than that
given for the removal of the county seat, as evidence of the num-
ber of votes in the county.

The principle upon which the court rested its judgment was,
that the return of the officer of the votes on the proposition of re-
moval of the county seat was not conclusive of the number of
voters in the county.    But the vote given for the circuit judge
might be looked at as showing that there were a larger number of
voters than those voting for the removal. It is distinctly conceded
in the carefully considered case reported in 1 Sneed., *supra*, that
the law might refer to the vote cast for governor at the last elec-
tion, or for the president, as a test of the number of voters.

If those who do not vote are taken as conclusively assenting to
the majority, then the application of that rule in this case would
have precluded the court from any inquiry or necessity of inquiry,
as to the number of electors in the county.    It accepted those who
voted for the circuit judge, as evidence that there were more voters
than those who cast ballots for or against the removal.    The court

had within reach, safe, tangible and reliable means of ascertaining the fact, and availed itself of it.

None of the authorities deny or dispute the position that if the law requires a majority of the electors of a county, city or town to vote for a proposition, before the subscription or credit shall be given, or the other thing contingent on the vote shall be done, that the proposition fails, unless such majority is given. Is the ballot box the test of the result?

The practical question presented is, whether the constitution means if one, or five, or one hundred vote for the aid, the measure is carried; or whether it means that a definite number of the entire body entitled to the ballot, must assent by an affirmative vote, that definite number being two-thirds of the whole body.

Unless the law under which the vote is taken intends otherwise, the *ballot* is the test in two particulars: first, of the number of the electors, and second, if there be those who do not vote, then that they acquiesce in what the majority voting do. The rule in its original application to corporations, and the election of officers, originated in necessity. That there should be no vacuum in those offices in which the constituent body or the public had an interest, there was no mode by which the elector could be compelled to vote. That there might be no interruption in the functions of office, a majority choosing to exert their privilege was sufficient to fill the place. But as we have seen in cases other than the election of officers, the count of the ballots is accepted as the criterion of numbers, not because of the inflexible rule of law, but of the seemingly insuperable difficulty of getting any other which is not loose, shifting and unreliable. The necessity of the rule for the sort of elections for which it was framed, is apparent. When the practice obtained in these late years of giving municipal aid to railroads, and other public enterprises, on an approving vote of the people, the courts applied the rule in reference to the election of officers. If no other

or better test was furnished of the number of voters in the muni-
cipality; if it can be gathered from the terms of the law under
which the election is held, that a majority of two-thirds of the
constituent body is requisite, that majority is necessary to a
choice. That doctrine is illustrated in a late English case, of Re-
gina v. Guardians of St. Martin's in the Fields, 5 Eng. L. & Eq.
Rep., 361. The officer (treasurer) was to be elected by two-thirds
of the electors present. Eleven voted for one man, and ten for
another (the *chairman not voting.*) " For the chairman being pres-
ent ought to vote, and is considered a voter present, in order to
determine whether either candidate had a majority of the votes."
Here the "electors present," were the "constituent body." A
majority of them was necessary to a choice. The court had in-
formation of the fact, nor did they adopt the doctrine that the
" chairman " assented to the vote of " the eleven," because the
particular law required otherwise.

Recurring to the 14th sec. of art. 12, and giving to the words
their ordinary signification, what is their obvious and grammatical
import? It seems to be plain that the "county * * * shall
not become a stockholder or lend its credit, * * * unless
that is (upon no other condition than) two thirds of the qualified
voters * * * * at a special or general election, * * *
shall assent thereto." All would agree that the requisite number
" two-thirds " must assent. That "assent" to fulfill the demands
of the language must be given or expressed, in some mode or
orther, at an " election." The two-thirds thus assenting, must be
that number of the "qualified voters of the county." The de-
batable ground begins at this point. How within the intent of
the constitution shall this " two thirds" manifest or give evidence
at an *election* of " assent," by staying away from the polls, or be-
ing present and voting? The constitution which, in the 5th sec-
tion of the same article, had absolutely prohibited the faith of the
state from being pledged or loaned for such a purpose; and which
was putting restrictions on the power of the legislature, to author-

ize counties, etc., incurring such burdens, unless a great majority of its voters desired it, ought not to be so construed, as that one hundred, or five hundred, out of three thousand voters, could by any possibility create the debt.   Reading both sections together, and they announce this policy :   The credit of the state shall not be pledged or loaned in aid of any person, association or corporation.   But if it is the desire and policy of a county,   *   *   * etc., to aid any association or corporation in any public work;  as a railroad or canal, or turnpike, etc., etc., of great local benefit, it may do so if deemed prudent and wise by two-thirds of its qualified voters expressed at an election.   We think clearly that the constitution means an overt, affirmative assent evidenced by voting for it.

The power granted to the municipality is, in effect, a power to tax :   "Taxes are burdens imposed by the legislature upon persons or property, to raise money for 'public purposes.'"   Manifestly the object to which the aid is extended must be "public," in the sense that it will contribute to the convenience, prosperity and general advantage of the "local public."   It has been established by authority, that aid to a railroad corporation is a "public purpose," for which the county may lend its aid.   But that has not met the universal approval of the judicial mind.   But aid to a steam saw and grist mill company, Allen v. Inhabitants of Jay, 60 Maine Rep., 124, or for any private business of manufacturing, or for aid to a school established by the will of a citizen, Jenkins v. Andover, 103 Mass., 94, or a school which was a private enterprise, Curtis v. Whipple, 24 Wis., 350, are not "public purposes" for whose benefit taxes may be imposed, although such businesses may contribute to the improvement of the community where located.

Long usage and acquiescence have declared railroads as one of the "public purposes," for which municipalities may impose taxes on persons and property.   It would not be safe, wise or prudent to push the power beyond the line already established in usage,

legislative and judicial sanction.    Nor should we be inclined to tolerate that construction of the 14th section which would authorize the board of supervisors to lend the aid or credit of the county, to "any person, association or corporation," unless for an object which in the history of legislation and judicial sanction is recognized as "public" to the county.    It is not within the limits of legitimate and constitutional taxation, to impose burdens upon persons and property to build up private enterprises and fortunes. It is pressing the power of taxation, the strongest committed to the government, to its extreme limit, when it is referred to any number of the electors of a municipality to impose the onus of taxation, upon not themselves only, but upon other property holders and persons now voters, in aid of some enterprise or public work, not owned and controlled by the municipality, not necessary for the uses and purposes for which such municipality is created, but advantageous in the sense that it contributes to the advancement and increase of the wealth and business of its inhabitants.    The power is dangerous, and greatly liable to abuse. Whilst this is so, it is also true that a wise, cautious and prudent use of county credit may result in public good.

We are persuaded, that the constitution, for the protection of minority interests, intended that this power of creating a debt to be paid by taxation, for a local "public object," should only be exercised, after it had been approved by that preponderating number of the voting class (two-thirds) as would give reasonable assurance that not only the object upon which the aid was bestowed, was a proper one, but also that the judgment of those most interested approved the loaning of the credit.    It meant to put it out of the power of the few to impose the debt upon the many.    To make it impossible for those proposing to construct a railroad (for instance) to procure the bonds of a county in its aid, unless the scheme had the deliberate approval of the people, manifested by their votes.

When a statute, or section of the constitution is expressed in

general or limited terms, the law makers shall · be intended to mean what it has plainly expressed, and consequently no room is left for construction.   United States v. Fisher, 1 Cranch, 244. The object of construction applied to the constitution is to give effect to the intent of its framers, and the people in adopting it. This intent is to be found in the instrument itself.

The observations of Bronson, J., in People v. Purdy, 2 Hill (N. Y.), 35, have great force; remarking upon the danger of departing from the import and meaning of the words employed to express the intent, and hunting after probable meanings, not clearly embraced in the language, he says : " In this way the constitution is made to mean one thing by one man, and something else by another, until in the end, it is in danger of being rendered a mere dead letter, and that too when the language is so plain and explicit that it is impossible to mean more than one thing, unless we lose sight of the instrument itself, and roam at large in the fields of speculation."

To get at the thought or meaning expressed in a statute, a contract, or a constitution, the first resort, in all cases, is to the natural signification of the words, in the order of grammatical arrangement in which the framers of the instrument have placed them.   If the "words" convey a definitite meaning, which involves no absurdity or contradiction with other parts of the instrument, then that meaning apparent on the face of the instrument, is the one which alone we are at liberty to say was intended to be conveyed ; and neither the courts nor the legislature have a right to add to or take from that meaning.   Newell v. People, 7 N. Y., 97 ; Denn v. Reid, 10 Pet., 524; Leonard v. Wiseman, 31 Md., 204; Cooley Con. Lim., p. 57.

What is the meaning of the word " assent," as used in the 14th section ?  Lexicographers define it, " the act of the mind in agreeing to, or assenting to a thing," " consent," or "agreement."  Consent is defined to be, "agreement in opinion or sentiment," " the being in one mind," " accord," " concurrence."   Giving to " as-

sent" then its natural signification, it would be the act of the minds of two-thirds of the voters of the county, "agreeing to," or "assenting to" the subscription, "consent to the subscription." The constitution of New York of 1821 contained this provision : "The 'assent' of two thirds of the members, elected to each branch of the legislature, shall be requisite to every bill creating, continuing or altering  *   * any body politic or corporate." Plainly, the obvious intent is, that all such measures must receive the " vote" of two-thirds of the members elected.    People v. Purdy, 2 Hill, 35.    The word "assent" is here used in the sense of expressing by affirmative act, to wit: voting, concurrence, consent or agreement that the bill shall pass.

The constitution is explicit in laying down a test of the number of votes requisite to approve an amendment proposed. 13th Art. : " And if it shall appear that a majority of the qualified electors, voting for members of the legislature, shall have voted for  *   * the amendment, then it shall be inserted," etc.

The constitution of Tennessee, adopted in 1870, contained this clause: " No part of the county shall be taken off without the consent of two-thirds of the qualified voters of such part."  The question considered in Cocke v. Gooch et al., 5 Heiskel, 308–9, et sequiter, was whether the clause meant two-thirds of those actually voting, or "two-thirds of the qualified voters in the part of the county proposed to be " taken off."  It will be remarked, that the language is of tantamount import, with that of the 14th section of the 12th art. of our constitution, unless the word "consent," in the former, has a more specific meaning than the word " assent," in the latter.    It is manifest that " assent," as used in the constitution of New York, above quoted, meant an expression of opinion by a " vote."  That comports, as we have seen, with the definition of the term.    In the Tennessee constitution, the " thought" embodied in the word "consent" is the same, viz: that " two-thirds of the qualified electors " shall manifest their concurrence by their votes, and such was the intent of the provision as held by the court.

There must be the requisite number as defined in the constitution, voting for the measure, otherwise it is defeated. Say the court: "Instead of presuming that those who did not vote, meant by their nonaction to submit to the result of a count of the votes cast, a proper reading of the constitution authorizes those who do not vote, to conclude that their vote against the project could avail nothing, as a fixed numerical strength was absolutely necessary to the success of the new county." The court refers to art. 2, sec. 27, of the same constitution, for an instance of the vote cast at the election determining the result. That section authorized cities, counties * * to give credit, to a person, corporation * * on the assent of three-fourths of the *votes cast* at such election. The bill was brought to restrain the organization of the new county, because the project had not been approved by the constitutional vote.

That was the "fact" upon which the title to relief rested.

Perhaps, under the machinery contemplated in the 2d and 3d sections of article 9 of the constitution, and the statutes passed to give them effect, better means exist in this state than elsewhere of determining the result of an election, such as was held in this case. The 2d section declares the qualification of voters, their requisite sex, age, residence in the county and state, registration, and citizenship of the United States. The right of those having the other qualifications to vote is completed and evidenced by registration. 3d section, and statutes on the subject. This section intends a registration " of all persons entitled to vote at any election," so that the evidence may exist in favor of those who have acquired the right by moving into the county, attaining majority, etc. There exists, therefore, in each county, a registration of the list of voters, which ought to show, with approximate accuracy, the names of those entitled to vote "at any election." In ascertaining, therefore, the result of an election requiring two-thirds of the qualified voters of the county to assent thereto, we think that the registration books are competent evidence on the

point of the number of qualified voters in the county. It would be open to proof to show deaths, removals, subsequently incurred, disqualification, etc. When the constitution uses the term "qualified electors," it means those who have been determined by the registrars as having the requisite qualifications, by enrolling their names, etc. It would be a fair construction of the 14th section, to hold that the "two-thirds" meant that number of the whole number whose names had been enrolled as legal voters. That furnished official evidence of those *prima facie* entitled to vote. But, in this case, in addition to the information contained in the registration books, it is admitted that there were from 2,000 to 2,500 qualified voters in Carroll county at the date of this election. The proposition submitted received less than half of 2,000 votes, and, of course, did not have the assent of *two*-thirds, as required by the constitution. The difficulty of proving the number of voters in the county has been obviated by this admission.

We are of opinion, therefore, that this proposition to subscribe for stock and issue bonds did not receive the assent of the number of voters required by the constitution.

There is no power, then, in the board of supervisors to impose the burden on the county, unless something has intervened which estops the tax-payers from claiming the relief sought.

The boards of supervisors are a *quasi* corporation, with a general jurisdiction of the subjects confided to them in the 20th section of 6th article of the constitution; after the enumeration follow the words, "and perform such other duties as shall be provided by law." The grant of power to such a body, of an extraordinary character, such as is not embraced in the general scope of its duties must be strictly construed. When exerting jurisdiction under a special law, it must act strictly on the conditions under which it is given. In Ballard v. Davis, 31 Miss. Rep., 526, it is said the terms of the law conferring a special jurisdiction (there a tax for levee purposes) must be strictly pursued in the mode prescribed in the statute. The same rule has been enforced else-

where in reference to similar bodies. Commissioners of Hamilton v. Mighels, 7 Ohio St. Rep., 109, 115; Striker v. Kelly, 7 Hill, 9.

Another manifestation of the principle is, where one acts under delegated authority, as an agent or an officer of the government. There is no controversy or disagreement in the courts as to the general rule. In Hagan v. Barksdale, 44 Miss. Rep., 191, it is said: "those dealing with others (not in virtue of original, inherent right), but acting as delegates for others must, at their peril, know the extent and measure of the authority. Others are bound, if at all, by reason of the authority delegated for that purpose."

In the matter of the Floyd acceptances, 7 Wallace, 676, the doctrine is applied in all its force, to the acts of an agent or officer of the government, in transactions in negotiable paper. The person who deals with him knows that he acts by virtue of a delegated power; "must, at his peril, see that the paper on which he relies comes within the power on which the agent acts. This applies to every person who takes the paper afterwards. For the protection which commercial usage throws around negotiable paper can not be used to establish the authority by which it was originally issued." "These principles," say the court, "are applicable to the transactions of government."

A county has no inherent right to become a stockholder in a railroad corporation, or any other association for making public improvements, nor can it issue its bonds for such purpose.

If empowered so to do, it must conform to the conditions prescribed in the law. By the statute, the board of supervisors is made the organ and instrumentality of the county. But its power does not come into existence except upon certain conditions, which are of the nature of conditions precedent. Those are an approving vote of the constitutional majority at an election, assenting thereto. If the requisite notice of the election has not been given, or it has not been held at the proper time and place,

or if no election at all has been held, or if held, and the proposition has not received the requisite vote, then the terms upon which the board can put in motion its statutory power, to make the subscription and issue bonds, have not come into existence. If these, or any of these recitals are true, a subscription would be invalid, and the bonds would be without warrant of law to uphold them.   As between the county and the corporation or association to whom bonds are issued, such defense can be made.

How far these or any of these matters of defense may be set up against a *bona fide* holder of the bonds acquired in due course of business, the authorities are not agreed.

Many of the state courts, after great deliberation, have held that the officers of a municipality, inasmuch as they are exerting an extraordinary power, do not bind the county to pay the subscription or the bonds, unless issued in conformity to the law, which is, as to them, a power of attorney, and that any person proposing to purchase bonds, must, at his peril, enquire as to whether they are legally issued or not.

Other courts, especially the federal tribunals, hold that if a statute authorized the county or other municipality to give the aid, and issue the bonds, then the presumption will be indulged conclusively in favor of the *bona fide* holder; that all the conditions and prerequisites have been complied with, and that the county or municipality is estopped from setting up such non-compliance with law.   Perhaps in all the cases in the supreme court of the United States, the bonds themselves contained a recital of a compliance with the conditions precedent, or the records of the county imported on their face such compliance.   The cases in that court are Knox County v. Aspinwall, 21 How., 539 ; Bissell v. Jeffersonville, 24 How., 287 ; Pendleton v. Amy, 13 Wallace, 298 ; Lexington v. Butler, 14 Wallace, 282 ; Grand Chute v. Winegar, 15 Wallace, 355 ; Kennicott v. Wayne County, 16 Wallace, 452 ; Moran v. Miami County, 2 Black, 722 ; Gelpcke v. City Dubuque, 1 Wallace, 175 ; Supervisors v. Schenck, 5 Wallace, 772.

If the bonds contain no recitals, and the purchaser has not examined the records of the county to see whether the county authorities have complied with the law, whether he occupies such vantage ground, as would shut off such defenses, has not perhaps been precisely decided by the supreme court.

Many of the state courts hold to the opposite view, viz: The invalidity of the bonds may be pleaded against a *bona fide* holder, in that the bonds were not issued by the municipal authority, in the circumstances authorized by law. People v. Mead, 24 N. Y., 124; Harding v. Rockford & R. R. R. Co. (supreme court, Illinois), Chicago Legal News, vol. 5, 424; 11 Ohio St., 183; State v. Green County, 54 Mo., 574; State v. Callaway County, 51 Mo., 402; Carpenter v. Lathrop, 51 Mo., 483.

It is not involved in this case, and we forbear to express an opinion upon it, as to how far the county or the tax payers are estopped, and concluded from setting up the character of defenses, we have been considering, after the bonds may have been purchased by a *bona fide* holder.

The bonds in question have not been negotiated. No person has yet acquired the privileges of a *bona fide* holder.

The legislature had no power in the first instance to authorize the subscription and issuance of bonds, except upon the vote of the county.

If the project was not adopted by the requisite majority, plainly the legislature could not by a curative statute, cure so radical an infirmity. If there were mere irregularities in the election, at which two-thirds of the voters give their assent, these may be cured; but not the failure to hold an election, or a failure of the requisite majority. For that would be to impose the obligations on the county, in circumstances not warranted by the constitution and laws.

It has been argued also that the decision of the supervisors that the project was approved is conclusive on the county. That which confers the authority on the board is the vote of the two-

thirds.   The canvass of the votes, and decision of the board, is but evidence of the fact.   If the requisite favorable vote has been actually given, then the condition has occurred, upon which the county can insist upon the aid being given ; and the railroad corporation have a right to demand the subscription and bonds. The conclusion of the board, that the majority has been one way or the other, is not conclusive on the tax payers or the railroad corporation.   The authority to the board passes, or fails to pass, by the vote.   Whatever might be the effect of the decision of the board, in an action by the holder of the bonds, who took on the faith of the county records, it is not conclusive in a suit between the county and the railroad corporation, nor between the parties to this suit.   Lewis v. Commissioners of Bourbon County, 1 Central Law Journal, 517, and cases hereinbefore cited.

We are satisfied that the complainants are not estopped by any or all the matters relied upon, from a contestation of the validity of the bonds.   The suit was instituted before the bonds had been negotiated, and before third persons had acquired vested rights in them.   We refer to the cases hereinbefore cited.   Citizens Savings and Loan Association, etc., v. City of Topeka, Sup. Ct. U. S., February 9, 1874; Cent. Law Jour. (1875), pp. 156–9.

Decree reversed, and judgment may be rendered in this court.