51   111
88   703

MAYOR AND ALDERMEN OF THE CITY OF VICKSBURG VS. E. H. LOMBARD.  SAME VS. J. V. GARDNER.  SAME VS. E. H. LOMBARD.

1. MUNICIPAL BONDS: *Authority to issue.  Construction of charter of Vicksburg.*
    Where an act of the legislature revised the charter of the city of Vicksburg, defining its limits, creating a board of mayor and aldermen, and making them successors to the mayor and council, and vesting them with extraordinary power, such as right to issue a large number of bonds, and further providing for an election to be held at a future day named, for the officers in the act named, and repealed all other acts; but, nevertheless, provided, that said act take effect after its passage.  *Held*, that an election was not necessary to put the act into effect, but that the charter went at once into operation, and that the powers conferred by the act were not restricted to the board of mayor and aldermen thereafter "to be elected," but might legally have been exercised by the board of mayor and aldermen who, under the general law for filling vacancies, were appointed for the interim between the date of the passage of the act and the date of the election thereafter directed to be held.

2. SAME: SAME: *Validity of acts by* de facto *officers.*
    Even, if the circumstances of appointments to office be not in strict conformity to the law, nevertheless, if the power of appointment existed, and they were made by virtue of an act of the legislature, and entered upon their duties unquestioned and undisputed in this right, then color of right obtained, and as *de facto* officers, they were competent to do all things *de jure* officers might have done.

3. SAME: *Authority to issue bonds in negotiable form.*
    Express power is not essential to confer the authority to give municipal bonds a negotiable and commercial form and character.  It may be inferred from the intent of the act, indicated by its purpose and scope.  Reference may be had, in aid of this construction, to the prevailing usage and custom in money centers in regard to the form and incidents of bonds necessary to their highest availability for the purpose to be accomplished and the greatest benefit to the city.  Authority to issue

interest-bearing municipal bonds, having long maturities, to supply means to make costly improvements, or in aid of railroads, justifies the inference, that they were intended by the legislature to be sold in the market as commercial and negotiable securities. It may be safely assumed, that the legislature intended that the exercise of the power conferred should be made in a mode to promote the best interests of the city — to enhance the market value of bonds by divesting them of equities and making them negotiable.

4. SAME: *Place of payment; approval of form of bond immaterial.*

It is no objection that the interest was made payable in New York without express authority, or that the board did not appove the form of the bond adopted.

5. SAME: *Informality of registration of bonds.*

The purpose of the law, in requiring the registration to show to whom the bonds were " issued," was completely satisfied in showing to whom they were " sold." The terms are almost equivalent.

6. SAME: *Authority to make loans conferred by election; official declaration of result; innocent purchasers.*

Under the law a two-thirds majority of the votes, at an election held for that purpose, is necessary to authorize the loan to the railroads. But if the constituted authorities of a city are vested with exclusive power and duty to determine that fact, to canvass the votes and declare the result, then their decision, officially promulgated, that there was a two-thirds majority in favor of the loan, estops the city from setting up against a *bona fide* holder the plea that the official declaration of the result is false. This objection is only available to prevent the issuance of the bonds.

7. SAME: SAME: SAME: *Degree of diligence on part of purchaser.*

A purchaser is not bound to look beyond the official action of those to whom the law has confided the authority to ascertain and determine whether the requirements of the law, necessary to the loan, have been satisfied in the vote taken.

ERROR to the Circuit Court of *Warren* County.

Hon. GEO. F. BROWN, Judge.

These were three *mandamus* suits (submitted together) to enforce the payment of interest upon municipal bonds issued by the city of Vicksburg. One hundred thousand dollars were issued as a loan to the Vicksburg and Pensacola Railroad, by virtue of the law and an election authorized by it. Five hundred thousand

dollars were issued under the charter acts of the city, and are known as the "improvement" bonds.   By an act of the legisla ture, $100,000 of the $500,000 improvement fund was authorized to be loaned to the Vicksburg and Memphis Railroad, upon a vote by the people, to be had authorizing it.   The other $400,000 were expended under the charter acts for improvements.

The validity of the bonds is denied upon the following grounds:

1. Because the charter did not go into effect at the time of its passage; that an election of the officers created under the act was a condition precedent to its operation.

2. That the appointment by the governor made under the general law for appointment to vacancies in municipal corporations, was absolutely void; that no vacancies existed, because at the time there were no such offices as mayor and aldermen.

3. There was no express power to make the bonds negotiable.

4. That the registration of the bonds did not conform to the mode prescribed by the law.

5. That the loans to the railroads were made without the authority of the two-thirds majority of qualified voters.

The questions presented are nearly identical in all the cases.

The first act of incorporation referred to was adopted July 9, 1870.   The terms of incorporation used are, that the "inhabitants be, and they are hereby constituted a body politic and corporate, by the name and style of the mayor and aldermen," etc.   They are made the successors of the mayor and council.   The 16th section provides for an election of the officers, to be held after the first general state election, and the conduct of the election is confided to the mayor and aldermen.

The enacting clause provides that it shall take effect from and after its passage.

A supplemental act was passed July 20, 1870, authorizing the board of mayor and aldermen to issue $500,000 in bonds, for the improvement of the city, limiting the expenditure to $200,000 per annum.   Afterwards, by act of February 10, 1871, the board of

mayor and aldermen are authorized to exceed the $200,000 limit for the year 1871.

The court below awarded the peremptory writ, and the case comes to this court on writ of error.

The case was tried on the following agreed state of facts, but this agreement does not cover the railroad bonds. In that case it was conceded that in fact there was not a two-thirds vote; but the official count so stated:

" We, the undersigned, attorneys for the plaintiffs and defendants, hereby agree that the above styled case may be heard and adjudicated by the Hon. GEO. F. BROWN, judge of the circuit court of Warren county, upon the statement of facts hereinafter set out, to-wit:

" 1. The plaintiff is the *bona fide* holder of the bonds and coupons set out in the petition of plaintiff, without actual notice of any defects, irregularities or want of power in their issuance, and without any constructive notice, except such notice, if any, as he is charged with by the constitution and laws of the state, and the ordinances under which the said bonds were issued, and the records of the city of Vicksburg in reference thereto, and the city bond register.

" 2. The form of the said bonds and coupons is as described in plaintiff's petition and the exhibits thereto.

" 3. The persons assuming to act as mayor and aldermen when said bonds were issued, were appointed by the governor of Mississippi after the month ' of July, 1870, and were commissioned by him, and exercised the functions of said offices until September, 1872, when they delivered said offices to the persons elected, December 5, 1871.

" 4. The interest annually due on said bonds up to January 1, 1874, was paid by means of a tax levied on the property of the inhabitants of the city of Vicksburg.

" 5. The interest for the years 1872 and 1873 was paid by a tax levied for that purpose on the property of the inhabitants of the city of Vicksburg by the mayor and aldermen who were elected on the 5th of December, 1871.

" 6. The first election under the charter of 1870 was held on the 5th of December, 1871, and the persons elected then to fill the offices of mayor and aldermen, went into office in September, 1872.

" 7. As a matter of fact, the mayor and aldermen kept minutes of all their proceedings in a book kept for that purpose, when said bonds were issued, and had so kept minutes from the first of January, 1870. They kept also a book in which all ordinances passed by them were transcribed, and if plaintiff had at any time applied for permission to inspect the minutes and ordinance books, and the city bond register, it would have been granted him.

" 8. The following are true copies of all ordinances, minutes, records, etc., referring to the issuance of said bonds: "

[The ordinances, etc., are too lengthy for insertion here, but constitute a part of the record in the case.]

The agreement concludes as follows:

" The relevancy and competency as evidence of all the foregoing facts, are reserved on both sides, but no objection is made by either side on account of the sufficiency of the pleading to admit the facts. The object desired is to obtain a decision as to the validity of the bonds and coupons on the merits, regardless of the manner in which the case is presented, and it is also agreed that should the case be carried by either side to the supreme court, the case shall there be determined on the facts set out in this agreement, subject to the same objections above expressed.

" CATCHINGS & INGERSOLL,
*Attorneys for Plaintiff.*
" WARREN COWAN,
*Attorney for Defendant.*"

*Warren Cowan*, for plaintiff in error :

Cited the various acts of incorporation of the city — of 1825–1836, 1836 and 1870. Did the mayor and aldermen derive their power from the constitution, art. XII, or from the act of April 20, 1870 Neither authorized the governor to appoint the mayor and aldermen. Brady *v.* Howe, 50 Miss., 616; O'Leary *v.* Adler, *ante*, p.

28; Dill. on Mun. Corp., vol. 1, p. 278; Leachman v. Musgrove, 45 Miss., 533; Newsom v. Cocke, 44 id., 363. In order that there may be a *de facto* officer there must be a *de jure* office. Dill. on Mun. Corp. (2d ed.), vol. 1, p. 330; Decorah v. Bullis, 25 Iowa, 12; Welch v. Genevieve, 1 Dill. C. C., 130; Hildreth v. McIntire, 1 J. J. Marsh., 206. That the bonds are void. See Bank of United States v. Dandridge, 12 Wheat., 64; Cooley's Con. Lim. 3 ed.), pp. 191-2, also pp. 194-5; Lafayette v. Cox, 1 Ind., 38; People v. Mayor, 51 Ill., 33.

There are serious objections to the validity, even if they had been issued by the proper officer:

1. They are payable to bearer.

2. They were sold on the market.

3. They were not properly registered.

4. They were not issued by the mayor and aldermen, but by a committee.

There must be proper parties, and no person can take the benefit of a bond except the person named therein. Bouv. Dic., p. 212; Fuller v. Fullerton, 14 Barb. (N. Y.), 59; Cooley's Con. Lim., 74 to 78; Dill. Mun. Corp. (2d ed.), 62, 180; Koch v. Bridges, 45 Miss., 258-61; Cooley's Con. Lim. (3d ed.), 205; State v. Jersey City. 1 Dutch., 309. Municipal authorities cannot delegate authority. Thompson v. Shermerhorn, 6 N. Y., 92; Whyte v. Mayor, 2 Swan, 364; Thomas v. City of Richmond, 12 Wall., 356; Coller on Mun. Bonds, 133 to 137. They are payable to bearer without authority. 1 Dill. (2d ed.), 513, § 410; Pendleton County v. Amy, 13 Wall., 297; Marsh v. Fulton County, 10 id., 676; Marshall County v. Cook, 38 Ill., 44; Dill. Mun. Corp., p. 426; Loan Association v. Topeka, 20 Wall., 667.

*Catchings & Ingersoll,* for defendants in error:

Cited the several charters of the city, and insisted that the bonds are valid. Cited 1 Wis., 165; 19 Iowa, 209. The legislature had knowledge of the prevailing usage. Maddox v. Graham and Knox, 2 Metc., 56; Canal Bank v. Fisher, 1 Stock. Ch.,

667, 692. See, also, Clapp *v.* County of Cedar, 5 Iowa, 15; 3 Kern., 599; Dill. on Corp., vol. 1, § 405; 8 Gray, 480; 4 Duer, 480; 21 How., 575; id., 529. They are negotiable. 4 How. (Miss.), 396. The Mayor and Aldermen approved and adopted the form of bond issued. Ruggles *v.* Collier, 43 Mo., 359; St. Louis *v.* Clemens, id., 395; Smith *v.* Morse, 2 Cal., 524. A *bona fide* holder of the bonds has the right to presume that the requirements of the law have been complied with. City San Antonio *v.* Lane, 32 Texas, 405; 33 Mo., 440–49; 18 Grat., 338; 29 Cow., 174; 24 Ind., 457; 25 Ill., 317; 5 Iowa, 15; City of Lexington *v.* Butler, 14 Wall., 282. For further exposition of the same doctrine, see Com'rs of Knox County *v.* Aspinwall, 21 How., 539; Moran *v.* Miami County, 2 Black, 722; Supervisors *v.* Schenck, 2 Wall., 772; Rogers *v.* Burlington, 3 id., 654; Mercer *v.* Hacket, 1 id., 83; Meyer *v.* Muscatine, id., 385; Bissell *v.* Jeffersonville, 24 How., 287; Gelpcke *v.* Dubuque, 1 Wall., 175–203; St. Joseph Township *v.* Rodgers, ——. The mayor and aldermen paid the interest for 1871, 1872 and 1873. They are now estopped. 29 Conn., 174; 5 Wall, 772; 36 Mo., 294; 44 id., 197.

Simrall, J., delivered the opinion of the court.

These three cases involve the validity of the improvement and railroad bonds of the city of Vicksburg. The subject embraces the following questions:

*First.* When did the charter and supplement thereto, of July, 1870, take effect?

*Second.* Was the mayor and aldermen, under whose adminstration the bonds were issued, officers *de jure* or *de facto?*

*Third.* Did the city authorities transcend their power in making the bonds negotiable?

*Fourth.* Were the bonds registered, as required by the charter?

*Fifth.* Did the requisite majority of voters approve and consent to the loan of $100,000 of bonds to the Vicksburg & Memphis R. R. Co., and the issuance of a like amount of bonds to the V.,

P. & S. I. R. R. Co., in payment of subscription for stock. A question common to all of these cases is, whether the mayor and aldermen, in possession of their respective offices at the time the proceedings were begun, continued and ended in the issuance of the bonds, were rightfully in office, or were *de facto* officers. On the one side it is contended that they are usurpers, or intruders; on the other, that they are either *de jure* or *de facto* officers.

In July, 1870, the legislature passed an act to " revise the charter and extend the corporate limits of the city of Vicksburg." A critical examination of the act will show that it was intended to go into immediate effect as an act of incorporation. In the first section the city boundaries are enlarged and defined. The declaration is, the limits and boundaries shall " hereafter be " as follows, viz:   *   *   The second section constitutes the inhabitants a body politic. The words are, " be and they are constituted (such) by the name   *   *   of the mayor and aldermen." The fourth section provides for an election on the second Tuesday in August after the first state election; but the mayor and aldermen may enlarge the time for voting.   *   *   The fifth section limits the mayor and aldermen to making suitable arrangements for voting places, ballot boxes, etc., for holding the election. By the thirty-eighth section the mayor and aldermen " herein constituted shall be the successors of the mayor and council of the city," etc. The fortieth section repeals all laws and parts of laws inconsistent with the act, and makes it take effect from and after its passage. If a proper construction of the act be that the mayor and council continued in office until their successors in law, the mayor and aldermen, were elected, as provided for in the fourth and fifth sections, it would be impossible ever to hold that election in compliance with the act, for the direction is, that the election shall be held under regulations to be made by the "mayor and aldermen " whose offices are created by the act itself. On the 20th of July, 1870, a supplemental and amendatory act was passed, the sixth section of which authorized the issuance of bonds not exceeding $500,000, for the improvement of the city and funding all of its

outstanding scrip.   In order to the further elucidation of the subject it is proper in this connection to refer to the anomalous condition of things which, at that time and prior thereto, existed. When the state government was organized under the constitution of 1869, all the officers, whether state, county or municipal, were filled by military appointees, under the second reconstruction act of congress, or held at the sufferance of the department commandant.   The county offices had not been filled by election when the governor and legislature and state officers were chosen.   Their case was provided for by the sixth section of the twelfth article of the constitution, which conferred power on the governor and senate to appoint "all county, township and precinct officers," whose term of office shall continue until the legislature shall provide by law for an election of said officers."   The corporate offices of the towns and cities are not in terms embraced in this section.   To meet that case the act of the 20th of April, 1870 (Acts, p. 150), was passed, which provides that the governor, with the senate, if in session, shall fill by appointment all vacancies that now exist, or that may hereafter occur in the public offices of any city, town or county, or district, not embraced expressly in the appointing power conferred in the constitution.   The appointments may be made by the governor in recess of senate.   Under this statute the mayor and aldermen were appointed and entered upon their offices.   The fifth section of the supplemental act, passed by the same legislature a few days after the original, authorized the issuance of $500,000 of bonds for the internal improvement of the city, and for the absorption of the outstanding city scrip.   By the act of the 10th of February, 1871, passed by the same legislature, amendatory of the supplementary act aforesaid, the legislature positively and directly recognized the fact that the original act and the supplement, with immediate effect, and the further fact that the incumbents of the city offices were rightfully in the exercise of the functions conferred by the original and supplemental charters.   The second section of this last act authorized the mayor and board of aldermen to issue bonds in excess of $200,000, al-

lowed to be issued for the year 1871. That such excess may be provided for by ordinance of the mayor and aldermen, there has been a distinct recognition by the inhabitants of the city of Vicksburg, who submitted to their authority, by the payment of taxes levied for three consecutive years to pay interest on the bonds, and by the legislature, that the mayor and aldermen in office under appointment, by virtue of the act of 1870, April 20, were rightfully holding their several places, and discharging the duties and powers conferred by the original and supplemental charters.

In Ray *v.* Murdock, 36 Miss., 699, speaking in reference to an "officer" who had been appointed, the court say: "No provision is expressly made in the statute for supplying a vacancy in such a case, and it appears manifestly to be a *casus omissus.*" It is clear, say the court, it did not constitute the "officer" such "*de jure,*" because the power to make the appointment did not exist in the circumstances. The conclusion is, that being in under color and reputation of office, his acts as to the public are valid. The principle upon which the case rests is, if the power to appoint exists in any state of case, an appointment, though made in circumstances not warranted by law, constitutes the appointee a *de facto* officer. The power to fill the municipal offices of towns and cities is conferred upon the governor in recess of senate, and with the approval of the senate when in session, by act of April, 1870. The mayor and aldermen could have been appointed, and being in quiet and undisturbed possession, exercising the functions, their acts are valid. Kimball *v.* Alcorn et al., 45 Miss., 158; Cooper *v.* Moore, 44 id., 392; Brady, Dist. Att'y, *v.* Howe, 50 id., 623. The law is well settled that an officer who comes in by color of title may do all acts incident to the *de jure* officer, so far as the public and third persons are concerned. People *v.* Collins, 7 Johns., 552 553. Strangers are not bound to investigate his title, nor look for them; then the person is in actual exercise of the office under color of claim. Riddle *v.* County of Bedford, 7 Serg. & R., 392. The mayor and aldermen took possession of their offices by executive appointment under the act of the 20th April

1870.   They referred their right to the appointment, and the statute plainly that created " a color of title," if not a " *de jure* right." Certainly they were not usurpers, for such persons take possession " without any authority."   It was observed with truth by the supreme court of North Carolina (People ex rel. *v.* Staton, 73 N. C., 551), that there is no difference between the acts of a *de facto* and *de jure* officer, so far as the public and third persons are concerned.   And that is settled by the decisions in England and America.   The only substantial difference is, that the former may be ousted by direct proceedings, whilst the latter cannot be.   In that case the acts of a judge who came into office under an illegal election were held to be valid, because he entered the office by color of title.   The principle is salutary, essential to the repose and good order of society, that officers who are in possession without dispute, and with the acquiescence of the public and government, and who can refer their right to such an appointment as was made in this case, are for all the purposes of official acts as competent to do them as if no question could be made as to the strict rightfulness of the appointment.   Whether, therefore, their appointment was strictly regular or not, yet as they came in under appointments made by authority of an act of the legislature, they entered upon their offices under color of right, and all things done by them are valid, if valid done in similar circumstances.*

We are of opinion, therefore, that the mayor and aldermen were competent to do all the acts and exercise all the functions within the provisions of the charter and its supplement, which took effect as provided in the last section thereof, from their passage.

* The same principle is embodied in positive law.   Code of 1871, § 317. The official acts of any person in possession of any public office, and exercising the functions thereof, shall be valid and binding, as lawful and official acts, in regard to all persons interested or affected thereby, whether such person shall be lawfully qualified or not, " or lawfully entitled to hold such office or not," which is a literal transcript of art. 194, Code 1857, p. 138.

The features of the 5th section of the supplemental and amended charter, so far as they bear upon the subject under investigation, are: First, "That the mayor and board of aldermen shall, by ordinance, provide for the issuance by said city of bonds to an amount not exceeding $500,000; which bonds shall be employed for the improvement of said city as the mayor and board of aldermen may from time to time direct, and for the funding of all outstanding scrip of said city. The treasurer of the city shall give a bond, * * * conditioned, among other things, for the faithful accounting for, and paying over of, all bonds issued by virtue of this section, and of all moneys which shall come to his hands by reason of said bonds;" provided: "the treasurer of said city shall keep a book open at all times for public inspection, wherein shall be registered, at the time of its issuance, each bond issued in accordance with this section, which registry shall state the amount of said bond, its number, date of issuance, date of maturity, and to whom issued; and no bond shall be of any validity unless so registered." Bonds may be issued in payment of work done at par; "and whenever said bonds shall be disposed of for any other purpose, they shall not be valued in the transfer at less than five per cent. below par." Section 1 of the amendment of the charter, passed February 10, 1871, provides: "That so much of the 5th section of the above act as limited the rate of interest on the bonds, * * * to eight per cent., and the value of said bonds in the negotiation of the same to five per cent. below par, be so amended as to authorize the bonds to bear ten per cent.; and the negotiation of the same to be made at a valuation of not less than eighty cents on the dollar." In construing an act of the legislature, we must look to its scheme, the object proposed to be accomplished, as an aid to the construction of any part of it, so that the entire law may be made harmonious in all its parts, and a consistent whole. Two objects are presented in the 5th section of the amended and supplemental charter. One is, that the outstanding scrip of the city should be withdrawn from circulation. Second, that costly and extensive improve-

ments might be made of the character set forth in the second section. The scheme proposed for this accomplishment was the issuance of interest bearing bonds, having a long time to run. If the holders of scrip exchange them for bonds, they must take the bonds at par. So if contractors, who have done work for the city, accept bonds in payment, they must take them at par. But since the amount of improvements contemplated would be too onerous to be paid for out of the current revenues of each year, the plan was to improve the city on a credit, so as to distribute the burden over a term of years. Common experience would suggest that those who took contracts would require large sums of money to pay laborers, etc, and that means must be provided for those who could not take the bonds in payment and hold them as an investment. It was also desirable to induce the holders of scrip to exchange it for bonds; that object would be promoted by putting the bonds in such form as that they would easily be converted into money. That exigency could be met by making the bonds negotiable. But the city objects to the validity of the bonds, because the legislature did not confer the power expressly to make them negotiable (all of them are payable to bearer). But if express power is needed, is it not granted by the 5th section of the supplemental charter. "But whenever the bonds are disposed of for any other purpose, they shall not be valued in the transfer at less than five per cent. below par." What other purpose, except absorption of scrip and delivery in payment of work done, is meant, except it be a conversion of them into money, and its application to pay for improvements. For, as to what is known as the internal improvement and scrip bonds, they could be used for no other purpose except the specific object named in the charter. But it might be highly expedient to "sell a portion of the bonds and pay the money for the work," and that, we think, was what was intended, "as the other purpose for which they might be transferred."

The legislature in the act of the 10th of February, 1871, manifestly supposed that the bonds were intended to be negotiable for

the "words are," the "value of the bonds in the negotiation of the same * * shall not be less than eighty cents on the dollar." If it were doubtful, therefore, whether the express power were conferred (and we think it is not), after the city authorities have placed the construction upon the law, that they had the power, and after the legislature that granted the charter has placed the same construction upon it, the courts should conform to this practical interpretation as settling the doubt. That construction, too, is manifestly to the interest of the city. For whether the bonds are delivered over in payment for work or scrip, or sold, they would be worth more, and would realize more to the city in either use of them, if they were invested with the privileges and immunities of commercial obligations. But if this were too strained a construction to be placed upon the text of the law, would it follow that the holder of a bond or coupon for interest, must point to express words of authority in the statute. The question under consideration is common to each of the cases, under the act of April 5, 1872. Acts, pp. 23, 234. The city loaned to the Vicksburg & Memphis R. R. Co., $100,000 of these bonds. By the 20th section of the charter of the Vicksburg, P. & Ship Island R. R. Co., the city became a subscriber to its stock, and issued to it bonds to amount of $100,000 (Acts 1871, pp. 249, 250). These bonds are not expressly made negotiable. The object of loaning the bonds to the one company, and of delivering bonds to the other, was to place in their control facilities and means in and of their respective enterprises. One of the distinguishing features in the history of the internal improvements of the last quarter of a century, has been the vast stimulous and assistance furnished by municipal bonds (in many instances pushed too far). By the same means have the cities been paved, sewered, supplied with gas, and water, wharves, etc., to a great degree. Bonds thus issued bear interest, payable generally semi-annually, and have a long time to run (as in these cases), and are intended to be sold in the money markets as stocks and securities. They are assigned to be placed in these money centres, in or out of the state, where money is

most plenty and cheapest. Where, therefore, municipal bonds, bearing annual or semi-annual interest, with long maturities, are authorized to be issued for these, or such purposes, it must be presumed that the legislature intended that they shall conform to the known usage; that they shall have that form, and those incidents necessary to their availability. It is necessary that they should be negotiable, readily so, that each purchaser and holder would acquire a legal title, divested of all equities that might exist between the original parties. If they have not, the characteristics of negotiable instruments under the law merchant, they would not be readily saleable, and would not accomplish the object designed. Whether, therefore, the supplemental charter of the city, or the 20th section of the act incorporating the V., P. & S. I. R. R. Co. authorized in specific and express terms the bonds to be made payable to bearer or not, the right to put them in that form must be implied in the general power conferred. Commissioners of Knox Co. v. Aspinwall, 21 How. (U. S.), 539; Morris C. Banking Co. v. Fisher, 1 Stock. Ch., 667; Mechanics Bank v. R. R. Co., 3 Kern., 599; Clark v. Janesville, 10 Wis., 189; Clark v. Des Moines, 19 Iowa, 213; Lexington v. Butler, 14 Wall., 282.

It is further objected, that the interest is made payable in New York, without warrant of law. In Maddox v. Graham and Knox, 2 Met. (Ky.), 78–80, the same exception was taken; but the court said it was evidently the intention (of the legislature) to leave the place of payment to the uncontroverted discretion of the makers of the bonds. It was further remarked " that it was a well known fact that all such securities and the coupons for interest are made payable in one great commercial metropolis," which adds to their value. If there be any plausibility in the point, that the mayor and aldermen did not approve the form of the bond, it is answered by the same case, p. 77. It is said also that the $500,000 bonds were not registered, as directed by law, in this — that the law requires that the registry shall show to whom issued — where, as the entry upon it, is to whom "sold." In every other respect, as to number, date of maturity, amount,

the direction is pursued. Considering this clause of the act, in connection with the context, and it is manifest that it was devised so as to prevent an overissue and a fraudulent one. The several particulars were designed, as the law marks of each bond. That purpose is as well observed by the use of the word " sold" as " issued." The one word, as well as the other, would show the recipient of the bond, whether taken in payment for work or scrip, or purchased. If delivered to the one or the other, it can be said with accuracy, it had been " sold," or that it had been " issued" to him. It would be unsafe to apply so nice a criticism to words, when either express the act done and required to be done. The last question made, which is applicable, alone, to the bonds issued on account of the railroad corporations, consists in the offer, of the city, to prove that the loan of the bonds, in the one case, and their issuance in payment of subscription to stock, in the other, was not approved by a majority of two-thirds of the electors. The statutes under which the proceedings were had, required that the propositions should be submitted to a vote, and should be sustained by a two-thirds majority. Can that question be opened and litigated against the relators, purchasers of the bonds and coupons in question? It was suggested, and some observations made in respect of it, in Hawkins v. Carroll Co., 50 Miss., 735. A vote and the requisite majority may be conceded to be necessary, they may be conceded to be the conditions upon which the right to issue the bonds depends. But the election, in reference to these bonds, was held under the auspices of the city authorities. The mayor and aldermen canvassed the returns, and declared the result to be in ·favor of suscription and loan. If a purchaser had consulted the record of their proceedings, he would have found a recital " that the reports, certificates and proofs of the judges of said election " (had been canvassed) " showing that said election had been duly held, and that two-thirds of the qualified electors had voted in favor of " the proposition; "and the board did declare the decision of the qualified electors of said city to be in favor of," etc. Manifestly the law

referred the decision of that question to the mayor and aldermen, not conclusively, however, as we held in Hawkins *v.* Carroll County, *supra*, if those concerned, as the tax payers, intervene and contest, before the bonds have passed into the hands of purchasers for value.   But their decision is conclusive against the city, after the bonds have been negotiated and have come to the hands of an innocent holder.   That doctrine has been uniformly announced by the supreme court of the United States, commencing with the leading case of Knox County *v.* Aspinwall, 21 How., 539; Bissell *v.* Jeffersonville, 24 id., 287; followed by numerous cases reported in Black and Wallace.  Of the many cases decided by the state courts, we refer to City of San Antonio *v.* Lane, 32 Texas, 405; 33 Mo., 449; 24 Ind., 457 ; 25 Ill., 317.

The principle rests upon the sound reason, that if the constituted authorities of the city put the bonds on the market or deliver them to the railroad company for sale, on the assertion that the proper vote was given, the city ought to be estopped from setting up against the *bona fide* holder the plea that the assertion is untrue.   If irregularities had occured in giving notice of the election, or in conducting it, a purchaser would have a right to conclude that the mayor or a board of aldermen would have examined into them, and if of a grave character would have ordered a new relation.   A purchaser would have a right to conclude that there was no irregularity in the election, otherwise the mayor and board of aldermen would have (as was their plain duty) set it aside.   He might well conclude, also, that the tax payers who had a deep interest in the matter, would closely watch the proceedings, and arrest them if the law was not complied with.   When the authority exists, mere irregularities do not affect the title of the *bona fide* holder.   Bissell *v.* Jeffersonville, 24 How., 287 ; Bank *v.* Rome, 19 N. Y., 20; Gelpcke *v.* Dubuque, 1 Wall., 208 ; Royal British Bank *v.* Turquand, 5 E. & B., 248 a.

Counsel on both sides, in a written agreement, expressed the desire that the court should waive objections to the form of proceedings and consider the cases on their merit.   We have bestowed

such examination and reflection on the important questions discussed, as the pressure of business would allow.

The conclusion reached is, that the judgments ought to be affirmed.