## E. T. SYKES *v.* MAYOR AND ALDERMEN OF COLUMBUS.

1. CORPORATIONS. *Their powers.*

    In this state, corporations, municipal and private, are creatures of the Legislature, and have only such express powers as are conferred upon them, and such implied powers as are necessary to the exercise of those that are express.

2. SAME. *Town of Columbus. Power to issue railroad bonds under its charter.*

    Section 5 of the act incorporating the town of Columbus provides that the mayor and aldermen shall constitute a body politic, may sue and be sued, may exercise all the rights and privileges usually appertaining to bodies politic, shall have power and authority over all matters of police within the limits of the town, may make and promulgate such orders, ordinances, and rules for the harmony and good government of the town as they may think proper, and may levy a tax on property, etc. *Held*, that the mayor and aldermen of Columbus have no power, under this section, to issue bonds in aid of a railroad.

3. SAME. *Bonds of, invalid, when.*

    Bonds issued by a corporation having no power to issue the same are not valid, even in the hands of a remote holder, who has paid value for them.

4. SAME. *Illegal issuance of bonds. Legislative act to ratify.*

The act of 1872, which declares that " all subscriptions to the capital stock of the Selma, Marion, and Memphis Railroad Company by any county, city, or town in this state, not made in violation of the Constitution of this state, are hereby legalized, ratified, and confirmed," cannot be so construed as to validate the unauthorized act of a municipality in issuing bonds to said company before the adoption of the present Constitution, upon the ground that the issuance thereof was not violative of the Constitution of 1832, then in force. But said act must be construed with reference to section 14 of article 12 of the Constitution of 1869, which provides that "the Legislature shall not authorize any county, city, or town to become a stockholder in, or to lend its credit to, any company, association, or corporation, unless two-thirds of the qualified voters of such county, city, or town, at a special election or regular election to be held therein, shall assent thereto."

ERROR to the Circuit Court of Lowndes County.

Hon. J. S. HAMM, Judge, specially presiding, by exchange with Hon. J. M. Arnold.

On November 1, 1869, the mayor and aldermen of the town of Columbus caused to be issued to the Memphis, Holly Springs, Okolona & Selma Railroad Company a large number of bonds, with coupons of interest attached; which bonds were signed by the mayor, and countersigned by the treasurer and secretary of the board, for the town of Columbus. The bonds recite that they are " issued under, and pursuant to, the Constitution and laws of the state of Mississippi, the Charter of the town of Columbus, and ordinances passed by the Board of Mayor and Aldermen, and authorized by a vote of the people of said town at a special election held July 24th, A. D. 1869." The plaintiff in error brought an action of debt on certain of said coupons, which were overdue, and of which he was the *bona-fide* holder for value. The defendant below demurred to the plaintiff's declaration; on the ground that the town of Columbus had no power to issue, or cause to be issued, the said bonds and coupons. The demurrer was sustained, and the case brought to this court on writ of error.

*E. T. Sykes*, the plaintiff in error, *pro se.*

1. There is one important and distinguishing difference between the powers of a municipality whose charter embraces

the power of taxation, and those of a county, technically known as a *quasi*-corporation.   The former may exercise all of the power within the fair intent and purpose of its creation, and in doing so is not confined to any one mode of operation; but a *quasi*-corporation can do nothing in the absence of a statute or constitutional provision.   *City of Bridgeport* v. *Housatonic R. R. Co.*, 15 Conn. 475 ; *Copes* v. *City of Charleston*, 10 Rich. 496.   Hence it was always essential that the Legislature give to a county express authority to engage in railroad or other public enterprises, but it was not necessary, down to 1869, to empower cities and towns, in direct language, to subscribe to such enterprises.

2. It is admitted that these bonds were issued without express authority under the Charter of the city or laws of the state.   Justice Church, in the *City of Bridgeport* v. *Housatonic Railroad Company*, 15 Conn. 475, says : " We admit that in this country all corporations, public or private, derive their powers from legislative grant, and can do no act for which authority is not expressly given, or may not be inferred.   But if we were to say that they can do nothing for which a warrant could not be found in the language of the charter, we should deny to them, in some cases, the power of self-preservation, as well as many of the means necessary to effect the essential objects of their incorporation."   And, therefore, it has long been an established principle in the law of corporations that they may exercise all the powers within the fair intent and purpose of their creation which are reasonably proper to give effect to powers expressly granted.   In doing this they must have a choice of means adapted to ends, and are not to be confined to any one mode of operation.

Now, it is conceded that the Charter of Columbus, at the time of the issuance of these bonds, did not, as does section 13, Charter of 1872, now in force, provide for the issuance by said city " of bonds   *   *   *   to create a general fund to aid in any important work for the interest of the city," etc., but it must be borne in mind that the first Charter of Columbus.

was granted June 27, 1822, long before railroads were contemplated, and the selectmen were limited in raising tax in each year to a sum not exceeding 25 cents on every one hundred dollars' worth of property liable to taxation in said town; which was enlarged by an act of February 27, 1836, but the taxing power — section 10 — was not, however, materially changed. And it was not until. 1854, when the Charter was again changed, that the taxing power was sufficiently broad, by implication and reasonable intent, to cover the issue of bonds for railroads. And, as Justice O'Neall, in *Copes* v. *City of Charleston*, 10 Rich. 502, says, " because the subject of the action is new, it by no means follows that it may not be within the words conferring the power."

3. The issue of the bonds was legalized, ratified, and confirmed by the act of 1872. But the question confronts us, that, if the Charter of the city was silent as to the power of the city to tax, or issue bonds, for railroads, and there was no law of the state at the time authorizing the issuance of the bonds here, could the state subsequently, through its Legislature, constitutionally legalize it? Such a right is within the legislative power committed by the Constitution to the Legislature. It but affirms the act of a municipal corporation, and acknowledges it to be as good as if the Legislature had previously given the power. In doing so the Legislature is not dealing with a private corporation — between which and a municipality there is a great difference. The latter is always under the control of the Legislature; the former may stand upon their charters. *Copes* v. *City of Charleston*, 10 Rich. 496; *Sharpless* et al. v. *The Mayor, etc., of Philadelphia*, 21 Penn. (9 Harris) 147; *Bronson* v. *Kingie* et al., 1 How. 331. In the case of *Sutterlee* v. *Mathewson*, 2 Pet. 407, the Supreme Court of the United States say : " If the effect of the statute in question be not to impair the obligation of the contract, is there any other part of the Constitution of the United States to which it is repugnant? It is said to be retrospective. Be it so; but retrospective laws which do not impair the obliga

tion of contracts, or partake of the character of *ex-post-facto* laws, are not condemned or forbidden by any part of that instrument.

In the case of *City of Beloit* v. *Morgan*, 7 Wall. 623, 624, the Supreme Court of the United States say, in reference to curative acts: " The only point to be considered is the effect of this provision. That is not an open question in this court. Whenever it has been presented, the ruling has been that, in cases of bonds issued by municipal corporations, under a statute upon the subject, ratification by the Legislature is in all respects equivalent to original authority, and cures all defects of power, if such defects existed, and all irregularities in its execution. See, also, *Gilpeke* v. *City of Dubuque*, 1 Wall. 220 ; *Thompson* v. *Lee County*, 3 Wall. 327. The same principle has been applied in the courts of the states. (Referring to *Wilson* v. *Hardesty*, 1 Md. Ch. 66 ; *Shaw* v. *Norfolk County R. R. Co.*, 5 Gray, 180.)

" This court has repeatedly recognized the validity of private and curative statutes, and given them full effect, where the interests of private individuals were alone concerned, and were largely involved and affected. (Referring to *Sutterlee* v. *Mathewson*, 2 Pet. 380 ; *Wilkerson* v. *Leland*, 2 Pet. 627 ; *Leland* v. *Wilkerson*, 10 Pet. 294 ; *Watson* v. *Mercer*, 8 Pet. 88 ; *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 420 ; *Stanly* v. *Colt*, 5 Wall. 119 ; *Croxall* v. *Sherrod*, 5 Wall. 268.) The earlier and more important of these authorities are so well known to the profession, and are so often referred to, that it would be waste of time to comment upon them." See, also, *McMillan* v. *The County Judge*, 6 Iowa, 391 ; *The City* v. *Lawson*, 9 Wall. 485.

In *Thompson* v. *Lee County*, 3 Wall. 327, the Supreme Court of the United States say : " The question of the Legislature [in passing the curative act] was one of policy, and the determination made by it was conclusive." The election, in that case, was decided by the state courts to be irregular, and as conferring no power to issue bonds. The Legislature sub-

sequently passed a curative act, which was held good by the Supreme Court of the United States.

The power need not be in express terms, but may be conferred upon it by fair implication. *Campbell* v. *Kenoshee*, 5 Wall. 145. And the Legislature of a state, unless restrained by the organic law, has the right to authorize a municipal corporation to take stock in a railroad or other work of internal improvement, to borrow money to pay for it, and to levy a tax to repay the loan. And this authority can be conferred in such a manner that the objects can be attained either with or without the sanction of the popular vote. 3 Wall. 327.

Contracts made by municipal corporations, which, when made, were in excess of their authority, but subsequently have been confirmed by legislative action, are binding. If the contract is one which the Legislature might originally have authorized, the case falls within the principle above laid down, and the right of the Legislature to confirm it must be recognized. Cooley's Const. Lim. 379, and authorities in notes 1 and 2; *Ib.* 374–378 ; *City of Bridgeport* v. *Housatonic R. R. Co.*, 15 Conn. 475 ; *Copes* v. *City of Charleston*, 10 Rich. 496.

If a municipal corporation shall have voted moneys for such purpose without legislative authority, it is competent for the Legislature afterwards to legalize their action, if it shall so choose. Cooley's Const. Lim. 224, and authorities cited ; *Coffman* v. *Keightley*, 24 Ind. 509 ; *Board of Comrs.* v. *Brears*, 25 Ind. 110.

Long usage and acquiescence, however, have declared railroads as one of the public purposes for which municipalities may impose taxes on person and property. *Sharpless* et al. v. *Mayor, etc., of Philadelphia*, 21 Penn. 147.

Redfield on Railways, section 230, says : " It has been considered that a railway is so far in the nature of an improved highway that the Legislature may empower towns and counties to subscribe for stock in such companies whose roads pass through such towns or counties, and even when they tend to

increase the business of roads which pass through any portion of the territory of such towns or counties." And, in support thereof, refers to numerous adjudged cases in note 1, headed by the case of the *Louisville & Nashville Railway Company* v. *Davidson County*, 1 Sneed, 637.

In that case it is said that the "common agreement that the power of a county or town corporation is confined to its limits, has been everywhere met, and refuted or exploded."

Whenever a moral obligation exists on the part of the government to relieve one of its citizens, sufficient to support a promise if the same state of things existed between individuals, the Legislature has the right to recognize the obligation, and to discharge it by the imposition of the tax. 18 Barb. 615.

In the case at bar no objection was raised or urged by any one to the issuance of the bonds, to the healing act of the Legislature, or to the payment of semi-annual interest-bearing coupons, until the May coupons of 1873 fell due.

And here we desire to remind the court that the facts of this case are similar to those in the case of the *City of Bridgeport* v. *Housatonic Railroad Company*, 15 Conn. 475. Here, as there, the validating act of the Legislature was afterwards duly accepted and approved by the city. It is a matter of undisputed fact — an important element in this issue — that for several meetings after the passage of the healing act of 1872, and until a comparatively recent date, the defendants were regularly represented at, and participated in, the annual and other meetings of the stockholders of said railroad, by municipal officers (not officers *de facto*, holding only by appointment or authority of the military or reconstruction acts), chosen by the free and unrestricted suffrage of the voters of Columbus, thereby accepting and approving said act, and making it as binding upon them, and the issuance of the bonds as valid, as though in the first instance there was power under the city Charter to subscribe and issue bonds. Further, after the passage of the curative act, the city, for one or more semi-annual installments of interest, evidenced

by the maturing coupons, levied a tax and paid them to the holder.

Where the municipality has repeatedly recognized the validity of the bonds issued by them, by paying them out, levying taxes and paying interest on them for a series of years (as in this case), it is estopped from claiming that the issue is illegal. Herman on Estop., sec. 560. Hence it follows, independently of the curative act, that if the town of Columbus had the authority under its Charter, either directly or as an incident to its general powers, to levy the tax for the payment of these railroad bonds, and issued them payable to the bearer thereof, with semi-annual interest, and those bonds have passed to *bona-fide* holders, the principle enunciated in the case of *Craige* v. *The City of Vicksburg*, 31 Miss. 216, will apply, regardless of any non-compliance on the part of the officers of the road with their obligations.

*Leigh & Evans,* for the defendants in error.

1. The power to contract by natural or artificial persons is, of course, either inherent or derived from some authority competent to delegate the power. In the case of natural persons, the power is inherent. Artificial persons, such as corporations, are clothed with the powers of natural persons by legislative enactment, and, " being mere creatures of the law, they possess only those attributes and properties which the charters of their creation confer upon them.

" Municipal corporations, like other corporations, must be created by statute, and possess no power or faculties not conferred upon them, either expressly or by fair implication, by the law which creates them, or other statutes applicable to them." Dill. on Mun. Corp., sec. 9 *b.*

" They must look to the state for such charters of government as the Legislature shall see fit to provide. And the charter, or the general law under which they exercise their powers, is their Constitution, in which they must be able to show authority for the acts they assume to perform." " They have no inherent jurisdiction to make laws or adopt regula-

tions of government; they are governments of enumerated powers, acting by a delegated authority, and can exercise only such powers as are expressly conferred." Cooley's Const. Lim. 192, 195.

"A municipal corporation possesses, and can exercise, the following powers, and no others : first, those granted in express words ; second, those necessarily or fairly implied in, or incident to, the powers expressly granted ; third, those essential to the declared objects and purposes of the corporation, not simply convenient, but indispensable." Dill. on Mun. Corp., sec. 55, and cases ; *ib.*, sec. 9, p. 86.

The acts which a municipal corporation may perform being thus restricted to those authorized by the express terms of the charter, or fairly implied from, or incidental to, the powers conferred, it follows that an unauthorized issuance of bonds to a railroad is void, even in the hands of innocent holders.

Justice Clifford says : " Bonds payable to bearer, issued by a municipal corporation, if issued in pursuance of a power conferred by the Legislature, are valid commercial instruments ; but if issued by such a corporation which possessed no power from the Legislature, they are invalid, even in the hands of innocent holders." *St. Joseph Township* v. *Rogers*, 16 Wall. 659.

" Without legislative authority, a municipal corporation, like a county, may not subscribe to the capital stock of a railroad company and bind itself to pay its subscription, or issue its bonds in payment ; and if it does, the purchaser of such bonds is affected by the want of authority to make them." *Pendleton County* v. *Amy*, 13 Wall. 304.

" The authority to contract must exist before any protection as an innocent purchaser can be claimed by the holder ; * * * the person dealing with the agent, knowing that he acts only by virtue of a delegated power, must at his peril see that the paper on which he relies comes within the power under which the agent acts ; and this applies to every person who takes the paper afterwards." *Marsh* v. *Fulton County*, 10 Wall. 683.

"We have held that there can be no *bona-fide* holding where the statute did not in law authorize the issue of the bonds. The objection in such cases goes to the point of power. There is an entire want of jurisdiction over the subject. It is not the case of an infirmity, an irregularity, fraud, or excess of authority in an authorized agent. Where there is a total want of authority to issue the bonds, there can be no such thing as *bona-fide* holding." *East Oakland* v. *Skinner*, 4 Otto, 255, 258.

"If there was a total want of authority in the municipal officers to issue such bonds, they are void, even in the hands of holders for full value. Whoever deals in municipal bonds must be supposed to know what powers such corporations have to issue the securities." *Town of Middleport* v. *Iroquois County*, 4 Law & Eq. Rep. (No. 11), 298.

"This proposition is no longer the subject of judicial controversy." Dill. on Mun. Bonds, sec. 7, note 20; *South Ottowa* v. *Perkins*, 4 Otto, 260; *Kennicott* v. *Supervisors*, 16 Wall. 465; *Coloma* v. *Eaves*, 2 Otto, 484; Dill. on Mun. Corp.; secs. 372, 381; Cooley's Const. Lim. 196, 216, 217, and note; *Hawkins* v. *Carroll County*, 50 Miss. 763; *Hagan* v. *Barksdale*, 44 Miss. 191; *Mayor* v. *Ray*, 19 Wall. 477; *Town of Middleport* v. *Iroquois County*, *supra*; *McClure* v. *Oxford*, 4 Otto, 429.

2. It being, therefore, settled that there must be legislative authority, and that the want of it renders the bonds invalid, even in the hands of innocent purchasers, the all-important question is, What authority had this corporation?

It is admitted by plaintiff in error that there existed no *express* authority to the town to issue these bonds. But it is insisted that the powers conferred by the Legislature were sufficiently broad to authorize their issuance by implication.

In determining whether a municipal corporation has implied power to issue negotiable paper, it is necessary to ascertain the purposes for which they were issued — whether issued for the ordinary purposes for which the corporation was created, or

for some extraordinary purpose not within the ordinary scope of the corporate powers.

And even when issued in order to raise money for ordinary corporate purposes, or in payment of debts incurred in carrying out the usual objects of the municipality, the current of authority seems to be that there is no inherent power to issue negotiable securities.

Mr. Dillon says: "In respect to all these corporations and *quasi*-corporations, except, possibly, municipal. or chartered corporations proper, we suppose that there is no solid ground to contend that they have inherent or general power to issue commercial securities, and can only do so by virtue of express legislative authority." Dill. on Mun. Bonds, sec. 8.

The counsel for plaintiff in error seems to consider the language, "except, possibly, municipal or chartered corporations," as an admission by the author that these corporations do possibly have the power to issue bonds such as these now sued upon.

But it is obvious from an examination of other parts of the work that this section refers to bonds issued for ordinary debts of the corporation, where there is no question of the power to create the debt, and the mode of payment is the only question in controversy.

In section 5, page 9, he discusses the two kinds of municipal securities, ordinary warrants and negotiable bonds, and proceeds to show that "ordinary warrants" are not negotiable in the sense of commercial paper, and are liable to all equities, in whosesoever hands they come.

And it is while thus speaking of the mode of payment of ordinary debts that he says, in section 6, public or *quasi*-corporations, such as counties, etc., as distinguished from municipal corporations proper, have no power to issue negotiable bonds; but that it is argued that municipal corporations are clothed with large powers, which necessarily oblige them to use credit or to create debts — therefore, if they may create debts, they may borrow money to pay them; and if they may borrow

money, they have the incidental power to do like other borrowers — namely, give a negotiable bill, note, or bond therefor.

And then, in the same connection, he uses the language above quoted from section 8, and then says : " And in respect to municipal or chartered corporations, our opinion, as indicated in a preceding section (sec. 6), is that they also have no such inherent power, and no power whatever, except so far as conferred expressly or by fair implication."

And it is undoubtedly true that where the ordinary powers of the corporation, or the duties required of it, render it necessary or convenient to incur obligations, usually evidenced by bonds or other securities, the power to issue such bonds (in the absence of any other mode being pointed out) may be implied from the power to do that which renders it necessary or usual.

But where the debt or obligation is not within the ordinary scope and purposes of the corporation, then the power to create the debt, as well as to issue bonds or commercial securities in payment, must be expressly conferred.

And that this expression of Judge Dillon, " except, possibly, municipal or chartered corporations proper " (which counsel for plaintiff in error seizes upon as an admission of a doubt upon the part of the author), refers only to cases of ordinary debts, is obvious from section 6 on page 14 of the same work.

" It is an admitted and undisputed doctrine that the power of public and municipal corporations to subscribe to the stock of railway companies, and issue bonds therefor, must be expressly conferred."

Again : " The courts concur with great unanimity in holding that there is no implied authority in municipal corporations to incur debts or borrow money in order to become subscribers to stock of railway companies, and that such power must be conferred by express grant." To become stockholders in private corporations is manifestly foreign to the usual purpose intended to be subserved by the creation of corporate municipalities, " and hence the rule that, in order to exist, the authority must be specially conferred, and cannot be deduced

from the ordinary municipal grant." Dill. on Mun. Corp., secs. 106, 426.

" The first requisite to their validity would seem to be a special legislative authority to make and issue them — an authority which does not reside in the general words in which the powers of local self-government are usually conferred." Cooley's Const. Lim. 215, 217, and note; *Marsh* v. *Fulton County*, 10 Wall. 676; *Thompson* v. *Lee County*, 3 Wall. 330; *St. Joseph Township* v. *Rogers*, 16 Wall. 659; *Pendleton County* v. *Amy*, 13 Wall. 304; *Mayor* v. *Ray*, 19 Wall. 468.

It is, therefore, apparent and certain that there is no power to issue negotiable bonds to be implied from the usual powers given to such corporations.

3. The Charter of 1854, upon which the counsel for complainant relies, clearly gave no power for the creation of the obligation, or for the issuance of these extraordinary evidences of debt.

By the act of 1854 no words other than " the general words in which the power of local self-government is usually conferred " are employed.

The portions of the above act relied upon by counsel are as follows :

" Sec. 5.    *    *    *    And the said mayor and aldermen shall be known and designated by the name and style of the ' Mayor and Aldermen of the Town of Columbus,' and, as such, shall constitute a body corporate and politic, and shall have and exercise all the powers, rights, and privileges usually appertaining or belonging to bodies corporate and politic, and by that name may sue and be sued, plead and be impleaded, in any court of law or equity ; and the said mayor and aldermen shall have full power and authority over all matters of police within the limits of said town.   They shall have power to make and promulgate all such ordinances, rules, and orders for the harmony and good government of said town as the said mayor and aldermen shall deem necessary, right, and proper, not inconsistent with the Constitution of this state ;    *    *    *    and they shall have full power and authority to levy a tax on all property and things not hereinafter specified in this act, subject to taxation in the town.' "

This language in the act of 1854 is nothing more than that ordinarily used, and conveys no more power than is absolutely necessary to carry out the object of the charter— to wit, to enable the city authorities to preserve order and keep up the machinery of local government.

Every municipality must, *ex necessitate*, be clothed with these powers. These are not only "ordinary powers," but are necessary ones. Without power to make and promulgate "ordinances for harmony and good government," there would be no local government, but only the general laws of the state would be in force. Without power and authority over all matters of police, the county officers alone could perform the duties of preserving peace and good order, and then only in such cases as the peace of the state was violated. This would be equivalent to no "local self-government," which is the very object of all municipal charters.

The power to tax is, of course, necessary to provide a fund for the preservation of this local self-government; so that, the grant of power to this municipality being only the usual grant of local government, and the authorities settling that the power to issue bonds does not reside in these ordinary grants, it follows that their issuance was without authority, and void.

*J. A. Orr*, on the same side.

On March 17, 1872, more than two years after the execution of the bonds, the Legislature enacted "that all subscriptions to the capital stock of the said company, made by any county, city, or town in this state, which were not made in violation of the Constitution of this state, are hereby legalized, ratified, and confirmed." Acts 1872, p. 314, sec. 4.

I think it susceptible of demonstration that this curative law is utterly valueless to the bondholders. It was doubtless the intention of the draftsman of the bill to validate the bonds, but he signally failed to use the terms necessary to accomplish that result, if the Legislature had possessed the power to vitalize the bonds without the sanction of two-thirds of the voters. Had apt words been employed, I will show that it was incom-

petent in the Legislature, under our present Constitution, to have validated these bonds without a two-thirds vote of the people.

The act is an abortion. It does not upon its face purport to legalize anything but the subscription. It does not mention the bonds. It does not provide any mode for their payment. There is no law which authorizes the levy and collection of any tax for their payment, and the curative law is oblivious of this fact. The general proposition that the Legislature may pass valid curative laws is not controverted, but, in the language of Judge Hill, two essential elements must concur : first, the confirmation and ratification must be definite and unmistakable ; and, second, the Legislature must at the time have the power to authorize what is intended to be legalized.

Judge Dillon cites a number of cases wherein the Supreme Court of the United States has· sustained curative laws. 1 Dill. on Mun. Corp., sec. 424, and note. It will be instructive to compare the Mississippi law with those sustained by that court.

The statute of Iowa sustained in *Gilpeke* v. *City of Dubuque*, 1 Wall. 177, was full and explicit — reciting all that had been done by the city authorities. It then proceeded to legalize and make valid the proclamation, the election, the issue of the bonds — not only those already, but those to be subsequently, issued — and authorized and required the city to levy and collect the tax to pay them, and withdrew the right from the city and the tax-payer to plead their invalidity. . This will serve to show the fullness of those curative laws which have been sustained. Those in *Thompson* v. *Lee County*, 3 Wall. 328, *Bissell* v. *Jefferson*, 24 How. 291, *Campbell* v. *Kenoshee*, 5 Wall. 203, were equally explicit and unmistakable. This comparison presents the insufficiency of the abortive act under review. This very act was the reliance of the bondholders in *Wells* v. *City of Holly Springs*, and Judge Hill's argument in adjudicating it to be nugatory is unanswerable. He says : " The mayor and aldermen, or other officers, are the agents for the

purpose of executing the powers conferred, and, as in case of other agencies, any acts done by them not interdicted by the fundamental law are not void as against public policy, though unauthorized when the act is done, and may be ratified by the Legislature, and, when so ratified, will be as binding as though the power had been conferred before the act was done; or, in other words, if the Legislature had the power to authorize the act before it was done, it may afterwards ratify it."

I adopt the rule as laid down by Mr. Cooley, in paragraph 371: "If the thing wanting, or failed to be done, and which constitutes the defect in the proceedings, is something the necessity for which the Legislature might have dispensed with by prior statute, then it is not beyond the power of the Legislature to dispense with it by subsequent statute; and if the irregularity consist in doing some act, or in the mode or manner of doing some act, which the Legislature may have made immaterial by prior law, it is equally competent to make the same immaterial by subsequent law."

It is clear from the rule stated that without such authority therein existing, or of a definite and unmistakable ratification and confirmation afterwards made, that the whole action of the mayor and aldermen must be held void. The declaration avers that " the election was duly and regularly held, according to the Constitution and laws of the state governing elections, and that more than three-fourths of the qualified electors residing in the city voted in favor of the subscription and the issuance of the bonds and coupons," which the demurrer admits. So that it seems assent was obtained, and the evil guarded against avoided; yet it was without legislative authority.

It is insisted that as the Legislature might have authorized the subscription and issuance of the bonds and coupons, upon the assent of two-thirds of the qualified voters at a general or special election held for the purpose of ascertaining that fact, that it had the power afterwards to ratify and validate the election, subscription, and issuance of the bonds.

But the answer to this proposition is that the election was, without authority of law, and, consequently, as though it had never occurred; in other words, null and void, and incapable of ratification.

It is evident that the election provided for by the Constitution was intended to be held under authority of law, and one in which fraudulent voters, or those committing offenses under the election laws, might be punished; but if the Legislature could ratify an election held without authority of law and these safeguards, then this wise and salutary provision of the Constitution might be evaded, and would amount to nothing. But if even the Legislature could ratify such unauthorized election, the act of March 16, 1872, under which the ratification is claimed, does not purport to ratify any subscription for capital stock or bonds not made in conformity to the requirements of the Constitution.

Another objection to this supposed ratifying act is that it does not confer power upon any of the towns, cities, or counties, whose action it purports to validate, to levy and collect taxes to meet their obligations. I am satisfied, not only must this extraordinary exercise of power, in making these subscriptions and issuing these obligations, be legally conferred by the Legislature, in conformity with the Constitution, but the equally and not less important power of levying and collecting the revenue necessary to meet them must be expressly and unmistakably conferred — which is not done by this act. Consequently, it could be effective only in cases where the power both to subscribe for stock and issue the obligations, assess and collect taxes and to discharge them, had been' previously given. Without further comment, I am satisfied that the subscription for capital stock, and the issuance in payment thereof of the obligations sued upon, were wholly unauthorized, so as to render them legal and binding, and for the want of which they are null and void.

The subscriptions were made and the bonds issued in violation of the Constitution and laws of the state. The issuance

of twenty-year interest-bearing bonds was a proposition never at any time submitted to the people, never voted on by them, and they have never been consulted on that subject. Violative of law because, Dillon says, "it is a general and undisputed proposition that municipal corporations possess, and can exercise, the following powers, and no other: first, those granted by express words; second, those necessarily or fairly implied in, or incident to, the powers expressly granted; and, third, those essential to the declared objects and purposes of the corporation — not simply convenient, but indispensable; and any fair, reasonable doubt as to the existence of power is resolved against the corporation, and the power is denied. The charter is its organic act. Neither the corporation nor its officers can do any act, or make any contract, or incur any liability, not authorized thereby. All acts beyond the scope of the powers granted are void." 1 Dill. on Mun. Corp., secs. 55, 426, and a great number of cases cited in the notes.

The want of power in a corporation or county to subscribe for stock in a railroad company, and issue its bonds in payment, is a constitutional limitation. Cooley's Const. Lim. 215; 3 Wall. 331.

What right has it to take the money of the citizen and appropriate it to the building of a railroad? It is not the sovereign. The Bill of Rights (Bill of Rights, 24, sec. 10, Code 1857) shields the tax-payer. " He shall not be deprived of his property but by due course of law." " Due process of law in each particular case means such an exertion of the powers of government as the settled maxims of law permit and sanction, and under such safeguards for the protection of individual rights as these maxims prescribe for the class of cases to which the one in question belongs." Cooley's Const. Lim. 356. " The meaning is that every citizen shall hold his life, liberty, property, and immunities under the protection of the general rules which govern society. Everything which may pass under the form of an enactment is not, therefore, to be considered the law of the land." *Dartmouth College* v. *Woodward*, 4

Wheat. 519.   The sovereign power of the state, through the Constitution, delegates certain rights to the created departments of the government, and to them it imparts all the powers they are to exercise.   To the legislative department, with the concurrence of the executive, is intrusted the taxing power. It is withheld from municipal bodies, except where specially imparted.

The distinction between private and public corporations has been given.   A railroad company is a private corporation. Cooley's Const. Lim. 191–193, 214[3], and note.   The interest which the people has in them has induced the exception to the rule of declaring all appropriation of the public money to private enterprises void, but the exception is never made, and cannot be invoked elsewhere than in an express legislative grant, and when it is undertaken by a county or city without this, it is simply *ultra vires* — unconstitutional, null and void. Now, when the subscription was made and the bonds issued, there was no law for either.   Both were, therefore, void.   If void, Judge Hill, in *Wells* v. *City of Holly Springs*, says "they are not the subject of ratification ; only voidable acts may be ratified."   And if the curative act should be construed to be valid, it did not pretend to do more than validate the subscription.   By what rule of construction can it be said that the act validated the bonds, and how can it appear that the city has the right to levy and collect a tax to pay the bonds?   The proper rule for construing this curative statute is given by Judge Cooley :

" The object of construction as applied to a written constitution is to give effect to the intent of the people in adopting it. In the case of all written laws it is the intent of the law-giver that is to be enforced.   But this intent is to be found in the instrument itself.   It is to be presumed that language has been employed with sufficient precision to convey it, and unless examination demonstrates that the presumption does not hold good in the particular case, nothing will remain except to enforce it.   Where a law is plain and unambiguous, whether it

be expressed in general or limited terms, the Legislature should be intended to mean what they have plainly expressed, and, consequently, no room is left for construction. Possible or even probable meanings, when one is plainly declared in the instrument itself, the courts are not at liberty to search for elsewhere. Whether we are considering an agreement between parties, a statute, or a constitution, with a view to its interpretation, the thing which we are to seek is the thought which it expresses. To ascertain this, the first resort in all cases is to the natural signification of the words employed, in the order of grammatical arrangement in which the framers of the instrument have placed them. If, thus regarded, the words embody a definite meaning which involves no absurdity and no contradiction between different parts of the same writing, then that meaning apparent on the face of the instrument is the one which alone we are at liberty to say was intended to be conveyed. In such a case there is no room for construction. That which the words declare, is the meaning of the instrument, and neither courts nor legislatures have a right to add to or take away from that meaning." Cooley's Const. Lim. 56–58; *Hawkins* v. *Carroll County*, 50 Miss. 758.

When the law is read, and it is seen that the subscription was all that was intended to be validated, and then we read Judge Cooley on the rules of construction, we can more fully appreciate the soundness of Judge Hill's opinion " that the ratification. and confirmation must be definite and unmistakable." To validate the bonds would require judicial construction, and that, we have seen, is never admissible. It is not for the courts to furnish curative laws.

2. But this law, if it had been full, definite, and unmistakable; if it had contained words legalizing, not merely the subscription, but the issue, of bonds, and had provided for the levy and collection of money to pay with, it would still be null and void, because, before its passage, the power was withdrawn from the Legislature to pass such a law.

" The Legislature shall not authorize any county, city, or

town to become a stockholder in, or to lend its credit to, any company, association, or corporation, unless two-thirds of the qualified voters of such county, city, or town, at a special election or regular election to be held therein, shall assent thereto." Const. 1869, art. 12, sec. 14.

It was or was not a stockholder; it had or had not loaned its credit to the company on December 1, 1869, that being the date of the adoption of the Constitution. If it was a stockholder, and had loaned its credit, then there was no necessity for a curative law. In that case the company, or the assignee bondholder of the company, could enforce payment as against individuals. If it was not a stockholder, and had not loaned its credit when the new Constitution took effect, the assent of two-thirds of the qualified voters was a condition precedent. It is clear that it was not a stockholder. To constitute a stockholder there must have been a lawful subscription. A lawful subscription is a contract. To support a contract there must be parties capable in law of contracting. But we have shown that neither the county nor the city could be a lawful party to such a contract without special legislative authority; therefore it was not a stockholder. This proposition syllogistically stated is abundantly supported by the authorities. Ang. & Ames on Corp., secs. 255, 517; *Hayne* v. *Beauchamp*, 5 Smed. & M. 537; Redf. on Rys. 81, 84, sec. 52. And the Legislature had no power to create it a stockholder.

Had its credit been loaned? What is credit? "The ability to borrow, on the opinion conceived by the lender that he will be repaid. This definition includes the effect and the immediate cause of the credit. The debt due in consequence of such a contract is called a credit." 1 Bouv. L. Dic. 351, title "Credit." If the credit was loaned, then the railroad company was the creditor. If a creditor, it had the right to the fulfillment of the contract. *Ib.*, title "Creditor." But we have shown that the pretended subscription and the issue of bonds were illegal and void; therefore the credit had not been loaned, and

the Legislature could not loan it without the assent of two-thirds of the voters.

It is manifest that the contract was invalid at the date of the adoption of the Constitution, and it is equally apparent that vitality could not be infused into it except through its provisions. The Constitution is the voice of sovereignty, and that " imports the supreme, absolute, uncontrollable power by which any state is governed " (Cooley's Const. Lim. 1), or " the right of commanding finally in civil society " (Burlamaqui, ch. 5) ; and our new Constitution, on the day of its adoption, became " the absolute rule of action and decision for all departments and officers of the government in respect to all the points covered by it, which must control until it shall be changed by the authority which established it, and in opposition to which any act or regulation of any such department or officer, or even of the people themselves, will be altogether void." Cooley's Const. Lim. 3.

In England the legislative power of Parliament " is the highest authority which the kingdom acknowledges on earth." 1 Bla. Com. 185. With us it is different. We have Constitutions in which, as Patterson, J., expresses it, " the forms of government are delineated by the mighty hand of the people, and in which certain principles of fundamental law are established." *Van Horne's Lessees* v. *Dorrance*, 2 Dall. 308. " The Legislature cannot mould and model the exercise of its power irrespective of the Constitution. All departments of government are subordinate to our written constitutions." 4 Wheat. 304 ; 2 Denio, 389.

In *Aspinwall* v. *County of Daviess*, 3 Mill. 377, " an amendment to the Constitution of the state, made after the vote of the people, and before the subscription, forbid the counties from loaning their credit to pay such subscription, and the bonds issued after this, in payment of a subscription made after the new Constitution went into effect, were void."

In *Township of Elmwood* v. *Marcy*, 2 Otto, 289, there was

a law of Illinois for the election and subscription and bonds, but they were issued by the supervisor and town clerk. That was not according to law. The Legislature passed a curative law, much fuller and more definite than our act of 1872. The Supreme Court of that state and of the United States held the curative law insufficient.

In *Town of Concord* v. *Savings Bank*, 2 Otto, 626, under a law of Illinois the town voted a donation, and it was accepted by the railroad company on June 20, 1870, before the new Constitution was adopted, on July 2, 1870, but the bonds were really not issued till October 9, 1871. The bonds were held void under the operation of the new Constitution.

SIMRALL, C. J., delivered the opinion of the court.

The power of municipal corporations to subscribe for stock, or to loan its credit in the form of bonds, with coupons for interest attached, in aid of railroad companies, has, under various legislation in the last few years, been a most fruitful subject of litigation.

In many aspects in which the subject has been presented, the argument may be considered closed, and a finality.

In the solution of such questions we can derive very little aid by recurring to the common-law corporations, whose powers and capacities rest on prescription and long usage. In these states corporations, municipal and private, are creations of the Legislatures, and have such powers and capabilities as have been expressly conferred upon them, and such implied powers as are necessary to exercise those that are express.

The test of the authority of a municipal corporation to borrow money, or issue its obligations redeemable in the future, is usually its charter, or some statute. The general purpose of bestowing upon cities and towns part of the sovereignty of the state, legislative, administrative, etc., is to aid the state, in the business of government, within their corporate limits — to provide for police, and those conveniencies, such as streets, pavements, wharves, water, gas, etc., needful to the health

and comfort of the inhabitants, and the prosecution of the various sorts of business in which they engage. The powers usually contained in their charters pertain to these and such like local and municipal objects. The suggestion of reason, that broad and general words and expressions should be referred to the specific powers, and the purposes for which they were granted, is a well-settled rule of construction. Hence, where a city was authorized to construct wharves and other facilities of commerce in its harbor, to erect water-works and gas-works, and in certain formalities *create a debt*, it was held, and properly so, that a debt could only be contracted for these specific purposes. *City of Lafayette* v. *Cox*, 5 Ind. 38.

It has been settled by unanimous concurrence of the courts (so far as we have examined), that a municipal corporation has no implied authority to issue bonds or other securities, or to borrow money or contract debts in aid of a railroad company, either as a donation or to purchase stock. It were a useless parade at this day to cite the authorities. Many of them are collected in a note to the text of Dillon on Municipal Corporations, volume 1, section 106.

The reason is obvious. Such use of the corporate credit is foreign to the purposes for which corporate municipalities were created. And such extraordinary exertion of power can only be justified by an express legislative grant.

Did the city of Columbus have such authority? We have been referred by counsel for plaintiff in error to the 5th section of the act of 1854, incorporating the city. The important parts are that the mayor and aldermen shall constitute a body corporate and politic; and shall sue and be sued, and shall exercise all the rights, powers, and privileges usually appertaining or belonging to bodies politic; shall have power and authority over all matters of police within the limits of said town; may make and promulgate such orders, ordinances, and rules for the harmony and good government of the town as they may think right and proper; and may levy a tax on property, etc.

The section may be thus analyzed:

1. The corporate name, "Mayor and Aldermen," is conferred; and by that name it may plead and be impleaded in the courts.

2. "Power" and "authority" over all matters of police, and to make "rules" for the "harmony and good government of the town."

3. The power of taxation.

4. The powers and privileges usually appertaining to bodies corporate.

We have here, specifically, the authority to make rules for the "police" of the town — a very comprehensive word, extending to matters of health, good order, safety of person and property; the power to pass ordinances for the "good government and harmony of the town," and the powers and privileges usually appertaining to bodies corporate — not all bodies corporate, but those of like character. The mayor and aldermen, under these four specific grants of power, may regulate streets, markets, and other local conveniences, may create a police, may enforce ordinances for these purposes and for the good order and harmony of the inhabitants, and may tax property to obtain the necessary means to carry on the city government. Every power points to an object local and domestic, purely municipal in its character, such as are necessary and usually bestowed on such corporate bodies. The legislative, executive, or administrative authority is thus restricted. The taxes that may be imposed are for the like limited scope.

We have also been referred to the 17th and 18th sections of the charter of the Mississippi Central Railroad Company (made part of the charter of the Memphis, Selma & Mobile Railroad Company). These sections empower the boards of police to subscribe for stock for the several *counties*. Other enactments have been referred to, which have no influence on the question.

It is well established by the authorities that, if the power did not exist, the bonds are not obligatory in the hands of the railroad company, or a remote holder who has paid value for them.

Municipal authority being a delegation of part of the state sovereignty, for the advantages and conveniences of local government, it would follow that those who deal with the municipality must take note of the extent of its power, and of any restriction, in the charter or in the general law, of its power of contracting. *Brady* v. *Mayor*, 20 N. Y. 312; *Swift* v. *Williamsburg*, 24 Barb. 427; 23 How. 381; *Marsh* v. *Supervisors of Fulton County*, 111 Wall. 675; *Hawkins* v. *Carroll County*, 50 Miss. 763.

It is quite plain, we think, that the city of Columbus did not have express power to incur the obligations sued on to the railroad company, and that there is an utter absence of implied power, since such aid to the railroad company was not necessary to accomplish any of the purposes declared in the Charter.

But it is said that although there may have been a lack of power in the mayor and council to have entered into the obligations originally, the act of the Legislature of 1872 has confirmed and ratified their acts.

The ratification or confirmation of an act which affects the rights, duties, and obligations of the parties to it, by legislative enactment, is the exercise of a most delicate power. The difficulty is to define precisely the limits of the rightful authority to pass curative statutes. The Legislature cannot make a contract between the city of Columbus and the railroad company. It could not by statute compel the city to take stock in the company, to loan its credit, and issue its bonds for the one purpose or the other. The authorities agree that the Legislature may validate and legalize a corporate act which the municipality might have legally done at the time, but which was invalid because of some irregularity in the exercise of its power. And there are, also, adjudications which hold

that where there was an absence of legislative authority, at the time the act was done, a subsequent ratification by the Legislature would make it legal.

It is, therefore, insisted that the 4th section of the act of 1872 supplied the want of power when the bonds were issued, and is of the same efficiency as the express grant of authority previously given.

But, in considering the effect of this statute, we must take into the account the provision of the Constitution adopted in 1869, as it may influence the question. The 14th section of the 12th article is : " The Legislature shall not authorize any county, city, or town to become a stockholder in, or lend its credit to, any   *   *   *   corporation," etc., except on the condition that two-thirds of the qualified electors assent thereto at an election. It would require no argument to prove that a Legislature, sitting under this Constitution, could not authorize the city of Columbus to become a stockholder, or loan its credit to this railroad company, except on the condition prescribed. But whilst that is conceded, it is insisted that it was competent to ratify this subscription, or loan of credit, made before the Constitution went into operation. Does not the Constitution, in such a case, forbid or deny the power to pass the ratifying act altogether?

We must clearly have before the mind the precise question for solution. It might be conceded that the Legislature in 1872 might pass a curative act, healing mere *irregularities* in the exercise of a power to subscribe, or loan credit previously given ; and still we must encounter the further question, whether the Legislature could ratify and confirm a subscription or loan which had been made without previous legislative authority, and before the Constitution became operative.

For the very reason that the city of Columbus incurred this debt without legislative authority, the contract is without validity, and so continued to be until the passage of the act of 1872. That act has the effect of imparting validity to the bonds by retroaction, or it has none whatever. But, before the

Legislature came to act, the new Constitution intervened and prohibited its consent, except on conditions. The legislative authority was not discretionary or absolute, but was subject to a condition which it could not dispense with.

The consequence is that a municipal subscription, or loan of credit, to a railroad company, made before December, 1869, cannot be validated by the mere expression of legislative consent or ratification *ex post facto;* but such obligations must stand or fall as the municipality had power or not to incur them. Since it was in the discretion of the Legislature to authorize such aid to railroads, so the authority could be withdrawn before the transaction had actually consummated into a contract with the obligation of which the state could not interfere. Thus, it was ruled in *Concord* v. *Savings Bank,* 2 Otto, 628, that although the act of 1867 permitted the town of Concord to lend aid to the enterprise on a vote of a majority of its electors, and the town had passed the needful ordinances, and a majority of the voters were for the " aid," yet before the " donation " was actually made to the railroad the revised Constitution of 1870 took effect, which annulled the powers of the municipality to make donations to the railroad company. The court say that the real question is, " whether power to make the donation existed when it was made, and it followed, if not made under authority of the act of 1867, before its annullment by the new Constitution, it could not be made at all." The corollary from the ruling in that case is that the Legislature could not, after the new Constitution went into effect, by retrospective act, have confirmed a donation which had not been authorized by statute.

The Supreme Court of Illinois, in *Marshall* v. *Silliman,* 61 Ill. 224, and *Wiley* v. *Silliman,* 62 Ill. 171, went further than is necessary to go in our case. That court held that, the election held in the township being illegal and void, the Legislature could not validate it, and authorize the township officials to issue the bonds. The reasoning is summed up thus : " If the debt is binding, it became so for the first time at the

passage of this law ; '' and that, in effect, the act imposed a debt upon the township for which it was under no legal obligation.

In *Hawkins* v. *Carroll County*, 50 Miss., it was not questioned that the Legislature might cure a defective or irregular exercise of a power previously granted ; it might cure irregularity in the election, but it could not dispense altogether with an election.   The act of 1872 is not relied upon to waive mere irregularities in the execution of the power — but as conferring *power* by *retrospective* operation.   If the bonds are obligatory on the city of Columbus, they become so for the first time by virtue of this statute.   The Legislature of 1872 could not by relation put itself back to 1869, and exercise power not denied or restricted by the Constitution of 1832. The measure of its power was the Constitution of December, 1869, and it could not ratify an act previously done, if at the date it professed to do so it could not confer power to do it in the first instance.   It could authorize a municipal loan conditionally.   In order to ratify and legalize a loan previously made, it was bound by the constitutional limitation of its power.

The act of 1872 might, with great plausibility, be construed as embracing only municipal subscriptions and aids to railroad companies made *after* the Constitution was adopted.   It confirms and ratifies those not in violation of the Constitution. It might well be supposed to refer more especially to the act of 1870, which authorized counties, cities, and towns to extend aid to railroad companies in whose enterprises they were specially interested, on complying with the terms of the Constitution.   It is well known that aid was extended, or attempted to be, to railroad companies by many of the counties, cities, and towns, under that act.   The language of the law of 1872 indicates that it had special reference to obligations incurred under the act of 1870, when not incurred in violation of the Constitution.   It ought never to be assumed that the law-making department of the government intended to usurp

or assume power prohibited to it. And such construction (if the words will admit of it) ought to be put on its legislation as will make it consistent with the supreme law. Confining the act to the confirmation of municipal subscriptions and loans incurred since the adoption of the Constitution, under statutes enacted under it, and it may have full effect to cure mere irregularities in executing the power conferred.

But such legislation cannot cure radical defects — as, where the terms of the Constitution have been dispensed with, either in the statute or by the city. If the broad meaning of the act of 1872, contended for, be given to it, then we are met with the constitutional limitation.

The idea implied in the ratification of a municipal act performed without previous legislative authority is that the *ratifying* communicates authority, which relates back to, and retrospectively vivifies and legalizes, the act, as if the power had been previously given. Such statute is of the same import as original authority.

It is analogous to the ratification by the principal of an unauthorized act by a person who assumed to be his agent. The act had no validity of itself, but the ratification relates to the time of doing it, and is of the same import as original authority. But if the principal falls under disability, or from any cause is disabled or incapacitated to confirm — as by insanity — then the unauthorized act stands on its original ground of absolute invalidity.

The principle is accurately stated in *Thompson* v. *Lee County*, 3 Wall. 331: "If the Legislature possessed the power to authorize the act to be done, it could by a retrospective act cure, etc., * * * because the power thus conferred had been irregularly executed." But the Constitution of 1869 prohibited the legislative authority to do the act, except conditionally. If the Constitution had altogether denied to the Legislature the delegation of such power to counties, cities, and towns, it is manifest that it could not vitalize and legalize a subscription made before its adoption,

and without authority of law. If that be so; it follows that, in dealing with the subject at all, it is bound by the limitation of section 14 of article 12 of the Constitution.

The result reached by the Circuit Court is in accordance with these views; wherefore, the judgment is affirmed.